# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-3999

_____

Wanda L. Bowen,                      *

                              *

        Appellant,             *   Appeal from United States

                              *   District Court for the

     v.                     *   Eastern District of Missouri.

                              *

Missouri Department of         *

Social Services,             *

                              *

        Appellee.            *

_____

Submitted:  June 14, 2002

Filed:  December 2, 2002
_____

Before RILEY, BEAM, and MELLOY, Circuit Judges.
_____

RILEY, Circuit Judge.


     Wanda L. Bowen (Bowen), a white female, worked as a case worker with the Missouri Department of Social Services (DSS).  Bowen resigned after complaining she was subjected to a racially hostile work environment.  Bowen thereafter filed a Title VII lawsuit against both the DSS and the Missouri State Workers' Union (SWU), alleging a racially hostile work environment, retaliation, and constructive discharge.  The DSS and SWU filed motions for summary judgment, which the

magistrate judge, sitting by consent, granted. Bowen appeals the grant of summary judgment in favor of the DSS on her racially hostile work environment claim. Reviewing the grant of summary judgment de novo and applying the same standards as the district court, Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 841-42 (8th Cir. 2002), we reverse.

## I.    BACKGROUND

From May 1997 through May 1999, Bowen worked as a case worker for the DSS. Upon hire, the DSS assigned Bowen to work in its midtown office in the City of St. Louis. Bowen's immediate supervisor was Francine Lee (Lee), an African-American. Bowen alleged Lee failed to provide her with training or supplies, and treated her harshly.

Early in her employment Bowen heard multiple co-workers comment that Lee did not like white people. By July 1997, Bowen believed Lee had been harsh with her, and after a particular exchange over caseloads, Lee suggested, and Bowen requested, a transfer to a different supervisor.

Upon learning she was being transferred, Bowen asked Lee what she should do with her assigned case files. Lee responded, "I really don't give a damn what you do with them. You can do anything you want." Bowen then entered the office of Ann Dintlemann (Dintlemann)[1], Lee's supervisor, who is white. Bowen asked what she should do with her assigned files. While Bowen was in Dintlemann's office, Lee entered and said, "I see you beat me in here. I might have known you would have done that. . . . Don't you roll them eyes at me." Turning to Dintlemann, Lee said, "Look, I want her out of my group and I want her out now. The sooner the better. Do you hear me?"

---

[1]In the record, Dintlemann has also been spelled Dintelmann.

-2-

Upon leaving the office that evening, Bowen told Lee, "Good night, Francine." In a loud, threatening voice, Lee responded, "You kiss my ass, you white bitch!" Moving near Bowen, Lee warned, "You better move on out 'cause I'm on my own time now." Within two days, Bowen filed a written grievance complaining of Lee's "hateful and threatening remarks." The DSS did not discipline Lee.

Bowen was transferred to another African-American supervisor, Judith Watts (Watts). Bowen retained her case worker position and continued to work on the same floor in close proximity to Lee. On a near daily basis, Lee directed hostile stares at Bowen.

In early January 1999, Bowen brought a pound cake to work to share with co-workers. When Lee discovered Bowen had brought the cake, Lee threw it on the floor and said, "Oops," stepped on it and again said, "Oops." Lee told Bowen's co-worker, "You can damn well tell her that I did it." Bowen filed a grievance complaining of the cake incident.

About this same time, Bowen also filed a grievance against Dintlemann alleging Dintlemann feared her subordinate African-American supervisors, especially Lee. Bowen alleged that Dintlemann was an ineffectual department supervisor because she ignored and concealed open and obvious racial harassment perpetrated by African-American supervisors against white employees and consistently refused to discipline African-American supervisors for their discriminatory conduct.

One of Bowen's white co-workers, who also was the union steward, Earl Malin (Malin)[2], testified Watts, Bowen's new supervisor, favored her African-American employees. According to Malin, Watts rated African-Americans higher in

---

[2]Malin is more often referred to as Patrick Malin in the record.

performance reviews and would not challenge their tardiness as she would white subordinates.

On January 21, 1999, Bowen and Watts engaged in a heated argument in Watt's office. The argument concerned whether Bowen had to verify client addresses before mailing letters from the DSS. Bowen claimed African-American caseworkers received preferential treatment and were not required to verify client addresses. When Bowen left the office, Watts entered another African-American supervisor's office, and Lee joined them. Returning to her workplace, Bowen overheard Watts complain, "I can't take this any more. I'm going home." Bowen then heard Lee respond, "No, and you shouldn't have to, and someone should do something about that menopausal white bitch." Bowen looked directly at Lee, who gave Bowen a harsh look and declared, "Yes, I am talking about you." Lee continued, "But right now I'm going to take you outside and we will settle this once and for all." Lee began to run directly towards Bowen.

To avoid physical contact with Lee, Bowen retreated inside her work cubicle. Lee ran past Bowen's cubicle, turned around, and walked past Bowen's cubicle, but did not enter. Trembling, Bowen tried phoning security, but she could not find the number. A co-worker told Bowen, "Whatever you do, don't come out of that cube."

Bowen notified Dintlemann, Lee's boss, and Malin, the union steward. Dintlemann downplayed the incident. When Bowen told Dintlemann she intended to contact the police, Dintlemann responded that she did not believe the incident warranted police involvement. When Malin arrived, Bowen's voice was trembling and her face was red. Malin assisted Bowen in writing a grievance, which alleged Lee had harassed and threatened her for two and half years, and local management had refused to take effective measures to stop the harassment. Bowen requested the DSS provide her "a safe work environment . . . where Ms. Lee is not permitted to threaten,

harass & humiliate me." Malin then instructed Bowen to contact the police, and he escorted her to the parking lot.

Later that day Bowen returned to the DSS midtown office with two police officers. Bowen, Malin, and the police officers met with four of the DSS managers to discuss the incident. Bowen told Shirley Bell (Bell), the DSS personnel manager, she was "afraid to come in here and work." Bowen told Bell that her co-workers had overheard Lee threatening to shoot fellow employees. Bowen then asked Bell, "What guarantee do I have that [Lee] won't come up and shoot me in the back as she has threatened to?" Bell responded the DSS could not guarantee Bowen's safety.

The DSS recommended Bowen accept a transfer to the DSS Prince Hall office located in North St. Louis. A police officer present at the meeting told Bowen she would be worse off working in North St. Louis. Bowen told the DSS managers she wanted to remain working in the midtown office. Unable to reach an agreement, the DSS placed Bowen on paid administrative leave. The DSS allowed Lee to continue working as a supervisor in the midtown office.

Shortly thereafter, Bowen obtained a protective order against Lee in the Circuit Court of St. Louis City.

The DSS declined to accept Bowen's grievances relating to the January 21, 1999 incident and the earlier cake incident before completing an internal investigation. Over Bowen's objections, the DSS gave her a temporary work assignment at its Prince Hall office, but never told Bowen the duration of the assignment. Bowen worked at Prince Hall for one week during February 1999. Thereafter, Bowen took sick leave for stress and high blood pressure.

On April 29, 1999, the Director of the Family Services Division notified Bowen in writing that the division had completed its investigation of her unlawful

treatment claims against Lee. The director informed Bowen the DSS had determined her claims against Lee were unsubstantiated, and advised Bowen the DSS would take no further action on her claims.

On May 3, 1999, Bowen resigned her position. In her letter of resignation, Bowen declared the work environment was "completely intolerable" and further declared that she could not and would not "risk [her] safety by returning to [her] former position."

In July 1999, the DSS gave Lee a five-day suspension for what the department deemed was "inappropriate behavior" towards Bowen. Immediately following the suspension, Lee retired.

Bowen sued both the DSS and the SWU. Bowen alleged racially hostile work environment, retaliation, and constructive discharge claims against the DSS, and a claim of race discrimination against the SWU. The DSS and the SWU both moved for summary judgment, which were granted. Bowen appeals only the court's grant of summary judgment on her racially hostile work environment claim against the DSS.

The magistrate judge found Bowen had failed to establish Lee's harassment affected "a term, condition, or privilege of employment" or that Lee's harassment of Bowen "was based on race." The magistrate judge determined the facts established "Lee had an extreme, intense dislike for" Bowen, but "[w]ithout some specific evidence that Lee's conduct directed toward [Bowen] was because [Bowen] was white," Lee's conduct toward Bowen did not rise to the level of a racially hostile work environment.

## II. DISCUSSION

### A. Hostile Work Environment

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has recognized Title VII is violated when discriminatory harassment is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).

To establish a racially hostile work environment claim, Bowen must demonstrate unwelcome harassment based on race which is sufficiently severe or pervasive as to affect a term, condition, or privilege of employment. Woodland, 302 F.3d at 843. Assuming Bowen's claim is principally one based on co-worker harassment, she must also show that the DSS knew or should have known of Lee's racially discriminatory harassment and failed to take adequate remedial measures to end the harassment. Id. The DSS does not dispute Bowen was subjected to Lee's unwelcome harassment.

To prevail, Bowen "must show both that the offending conduct created an objectively hostile work environment and that she subjectively perceived her working conditions as abusive." Williams v. City of Kansas City, 223 F.3d 749, 753 (8th Cir. 2000) (citation omitted). See Harris, 510 U.S. at 21-22. Harassment which is severe or pervasive is deemed to alter a term, condition, or privilege of employment. Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998). In Faragher, the Supreme Court emphasized "that conduct must be extreme to amount to a change in the terms and conditions of employment." Id. at 788. Guided by Harris, we have ruled workplace conduct does not violate Title VII unless it is "severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that

a reasonable person would find hostile or abusive." Gipson v. KAS Snacktime Co., 171 F.3d 574, 579 (8th Cir. 1999) (quoting Harris, 510 U.S. at 21).

We must "ensure that Title VII does not become a 'general civility code.'" Faragher, 524 U.S. at 788 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). Not all unpleasant and uncivil conduct creates a hostile work environment. See Woodland, 302 F.3d at 843; Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1051 (8th Cir. 2002); Willis v. Henderson, 262 F.3d 801, 808-10 (8th Cir. 2001). "[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher, 524 U.S. at 788 (quoting Oncale, 523 U.S. at 82).

### 1. Harassment Based on Race

The DSS argues, and the magistrate judge found, the evidence established nothing more than Lee had an extreme, intense dislike for Bowen unrelated to her race. We do not agree. Viewing, as we must, the evidence in the light most favorable to Bowen, we conclude she produced sufficient evidence from which reasonable jurors could infer that Lee's conduct toward Bowen was based on race. Lee's two "white bitch" epithets were explicitly racial and were directed specifically to Bowen, a white woman. Because the epithets carried clear racial overtones, they permit an inference that racial animus motivated not only her overtly discriminatory conduct but all of her offensive conduct towards Bowen. See O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1097 (10th Cir. 1999) (hostile work environment based on sex) (agreeing with Carter v. Chrysler Corp., 173 F.3d 693, 701 (8th Cir. 1999)).

### 2. Severe or Pervasive Harassment

Because the alleged incidents of misconduct spanned more than eighteen months, the DSS argues Bowen has not established Lee's conduct permeated the work place with sufficient severity or pervasiveness to create an abusive working environment. The magistrate judge agreed.

Bowen argues she need not establish that Lee's acts were both severe and pervasive, but need only establish severity. We agree with Bowen. A claimant need only establish discriminatory conduct which is either pervasive or severe. Harris, 510 U.S. at 22. Thus, we must determine if Bowen has produced enough evidence for a reasonable jury to decide whether Lee's conduct was sufficiently severe to alter the conditions of Bowen's employment and create an abusive work environment.

"Workplace conduct is not measured in isolation; instead, 'whether an environment is sufficiently hostile or abusive' must be judged 'by looking at all the circumstances.'" Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001) (quoting Faragher, 524 U.S. at 787, quoting Harris, 510 U.S. at 23). In analyzing Bowen's hostile environment claim, the magistrate judge did not address all of the factors outlined in Harris, which factors determine whether a work environment is "hostile" or "abusive." Harris, 510 U.S. at 23. The frequency of the discriminatory conduct, discussed by the magistrate, is only one of several factors to be considered. Other factors include the severity of the discriminatory conduct; whether the offensive conduct was physically threatening or humiliating, as opposed to a mere offensive utterance; and whether the offensive conduct unreasonably interfered with the employee's work performance. Id. Finally, a court should consider the effect of the misconduct on the victim's psychological well-being in determining whether the victim subjectively perceived the environment to be hostile or abusive. Id. "[N]o single factor is required." Id. Finally, the "[h]arassment need not be so extreme that it produces tangible effects on job performance or psychological well-being to be actionable." Carter, 173 F.3d at 702 (citing Harris, 510 U.S. at 22).

Our independent review of the evidentiary record leads us to conclude Bowen produced sufficient evidence to demonstrate the cumulative effect of Lee's discriminatory conduct towards her was sufficiently severe to defeat summary judgment. While Lee's discriminatory conduct towards Bowen was not frequent, neither was it infrequent. Reasonable jurors could find that Lee's hostility towards

-9-

Bowen pervaded the work environment, commencing in July 1997 with Lee's "white bitch" epithet and menacing remarks, continuing with Lee's frequent hostile stares, intensifying in January 1999 with Lee's violent act of destroying Bowen's cake, escalating on January 21, 1999, when Lee called Bowen a "menopausal white bitch" and threatened her with a physical beating, and climaxing when Lee intimidated Bowen by running directly at her. Bowen's co-workers had warned Bowen that Lee did not like white people and that Lee had threatened to shoot fellow employees. Lee's serious misconduct and Bowen's subjective fear of bodily harm adequately demonstrate, for summary judgment purposes, that Lee's conduct was both objectively and subjectively hostile or abusive.

We conclude Bowen produced sufficient evidence for a jury to consider whether, under all of the facts, Lee's progressively hostile conduct was sufficiently severe to alter a condition of Bowen's employment and create a hostile work environment.

### 3. Remedial Action

Assuming Bowen's claim alleges co-worker, as opposed to supervisor, harassment, Bowen must also show the DSS "knew or should have known of the racially discriminatory harassment and failed to take prompt and effective remedial measures to end the harassment." Willis, 262 F.3d at 808. The magistrate judge acknowledged, but did not discuss, this fifth prima facie element regarding the employer's knowledge. The record establishes Bowen filed three grievances complaining specifically of Lee's conduct and another grievance complaining that Lee's supervisor, out of fear, acquiesced in Lee's harassment. Within hours of Lee's insulting and intimidating conduct on January 21, 1999, Bowen reported to the DSS personnel manager her fear of working near Lee. The DSS manager told Bowen the department could not guarantee her personal safety. We conclude genuine issues of fact exist whether the DSS knew of the racially discriminatory harassment and took adequate remedial measures to end the harassment.

## III. CONCLUSION

We therefore reverse the entry of summary judgment in favor of DSS on Bowen's claim of a racially hostile work environment and remand for a trial on the merits.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.