# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1924

_____

Shelia Denise Smith,                    *
                                        *
            Appellant,                  *
                                        *    Appeal from the United States
      v.                                *    District Court for the
                                        *    District of Minnesota.
Fairview Ridges Hospital,               *
                                        *
            Appellee.                   *

_____

Submitted: May 11, 2010
Filed: October 27, 2010

_____

Before BYE, MELLOY, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Shelia Smith appeals the district court's[1] adverse grant of summary judgment on her discrimination claims against her former employer, Fairview Ridges Hospital ("Fairview"). Smith contends that Fairview constructively discharged her after subjecting her to a hostile work environment and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17. We affirm.

_____

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

I.

Construing the record in the light most favorable to Smith, see Johnson v. AT&T Corp., 422 F.3d 756, 760 (8th Cir. 2005), in March 2005, Smith was one of two African-American women employed as transportation aides for the Fairview emergency room ("ER") in Burnsville, Minnesota. Smith's primary responsibility was to transport patients from the ER to various other locations in the hospital. Her duties also included taking patients' vital signs, cleaning, and several other tasks delegated to her by the ER charge nurse, health unit coordinators, doctors, and technicians.

During the summer of 2005, Patricia Pousard, Smith's immediate supervisor, approached Smith to discuss several concerns Pousard had with Smith's conduct at work, including that Smith: (1) often failed to answer her telephone, (2) took lunch breaks at inappropriate times, (3) was rude to people on the telephone, (4) made too many personal calls, and (5) took frequent cigarette breaks. On August 17, 2005, Pousard prepared a Notice of Corrective Action ("NCA")[2] to address these concerns; however, pursuant to Smith's request, Pousard deferred officially filing the NCA.

In September 2005, Smith's performance review reflected positive comments regarding her performance as a transportation aide. Nonetheless, on November 15, 2005, Pousard officially filed the aforementioned NCA. The NCA was dated August 17, 2005, and addressed the issues that had been discussed with Smith during the summer. On November 28, 2005, Smith received another NCA, reflecting additional concerns with her performance. As a result of the NCAs, Smith was subjected to several limitations, including the requirement that she obtain permission from the

---

[2]A Notice of Corrective Action ("NCA") is a form used by Fairview to document an employee's misconduct or poor performance. After a written or verbal advisement is provided to the employee, it is placed in the employee's personnel file.

charge nurse, the lead health unit coordinator, and an ER technician, prior to taking any breaks.

On December 16, 2005, Smith's doctor wrote a letter to Fairview, indicating that due to a medical condition, Smith could not push or pull more than 70 pounds or lift more than 60 pounds for up to 3 months. As a result, Smith was unable to work as a transportation aide and began picking up shifts as a nursing assistant. This particular nursing assistant position did not entitle Smith to receive benefits. Consequently, Jenny Austerman, a payroll and benefits specialist at Fairview, suggested that Smith take a leave of absence from her position as a transportation aide, instead of working in the nursing assistant position, because Smith could maintain her benefits during a leave of absence. Smith did not follow this advice and continued working as a nursing assistant until her medical restrictions were lifted in early April 2006, when Smith resumed her former transportation aide position. Prior to returning to her job, Smith filed a Notice of a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), alleging race discrimination and retaliation based on several events occurring during her time at Fairview.

In May 2006, Smith received a third NCA. This NCA reflected Smith's excessive use of unscheduled time off, which had increased beyond the ER's maximum allowance. During her time at Fairview, Smith applied for various employment positions, such as the nursing assistant position in the operating room, but she was not considered for any of these positions based on the number of NCAs that were in her file.

Smith continued working as a transportation aide in the Fairview ER until June 7, 2006, when she resigned. In July 2006, the EEOC issued a letter of determination finding that there was "reasonable cause to believe that [Fairview] subjected [Smith] to a hostile work environment and retaliated against her in violation of Title VII." (Appellee's App. 149.) On December 1, 2006, Smith filed this action pro se, alleging

three Title VII claims: (1) hostile work environment, (2) constructive discharge, and (3) retaliation.[3]  The district court appointed counsel for Smith.  During the initial pleading stages, and throughout discovery, Smith alleged various instances of racial discrimination including:

1.      Soon after she began working at Fairview, a nurse asked Smith if she was Puerto Rican because she spoke Spanish.  Smith responded, "No, I'm black, look at me I'm black."  (Id. at 40.)

2.      In April or May 2005, Smith brought fried chicken to a Fairview potluck. Smith overheard a nurse inquire as to who had brought the chicken and then receive the response, "Who else?" (Id. at 32.)  Smith then responded, "What? Only black people eat chicken?"  (Id.)  Smith reported the incident to Pousard; however, no corrective action was taken.

3.      In May 2005, a picture of "Buckwheat," a character from the Little Rascals motion picture series who is an African-American child with braided hair, was posted on a door in the ER, along with other employees' childhood photographs.  The caption above the picture read, "Guess who this is?"  (Id. at 31.)  Smith inferred that the Buckwheat picture was placed on the door to represent her because she had recently braided her hair and was the only African-American employee whose childhood picture was not already on the bulletin board.  Smith reported the incident to Pousard; however, no corrective action was taken.

4.      In the summer of 2005, a nurse, who was not Smith's supervisor, grabbed a patient chart from Smith's hands and said, "[T]hese black aides don't know what they

---

[3]The district court interpreted Smith's pro se complaint as asserting these three claims, thus we do the same.

are doing." (Id. at 33.) Smith reported the incident to Pousard; however, no corrective action was taken.

5.      In September or October 2005, Smith brought a meal for lunch and upon entering the break room with the food, a coworker complained about a fish odor. The coworker was informed that Smith's meal contained fish, to which the coworker responded, "I smelled food that smelled better than that crap in my garbage." Smith then informed the coworker that it was an African dish. (Id. at 34-35.)

6.      In October 2005, Smith observed two coworkers using a work computer to view an article[4] on the website, The Onion.[5] The article discussed Hurricane Katrina and contained an image of a helicopter hovering over houses that were flooded by the hurricane. On the front porch of one of the houses, three people, appearing to be African-American, were pictured. The caption under the picture stated, "FEMA representatives call out to survivors, 'Show us your tits for emergency rations!'" (Id. at 138.) Smith reported the incident to Pousard; however, no corrective action was taken.

7.      In December 2005, Smith observed two coworkers using a work computer to view the website, www.getoffended.com. Smith claimed that one of her coworker's body language and facial expressions had invited her to look at what they were viewing. When she went to the screen, Smith observed two phrases written on t-shirts

---

[4]In Smith's pro se brief to this court, and in her deposition testimony, she states that this incident involved a video. The video she described showed Coast Guard rescuers telling black women to show them their "Big Black Boobs," if they wanted to be rescued. (Appellee's Br. 3.) However, Smith's attorney introduced a copy of an article, not a video, in the district court. Because the record does not contain a video, we only discuss the article.

[5]The Onion is a "political satire news source, which has a partnership with CNN." (Appellee's Br. 10.)

which stated: (1) "Guns don't kill people, only angry minorities kill people," and (2) "How do you stop five niggers from raping a white girl? You throw them a basketball." (Id. at 36.) That evening, Smith went home and viewed the website again, printing out several pages of its contents. Smith reported the incident to Sally Haack, Fairview's Human Resources Representative, who reminded the coworkers that personal internet use at work was inappropriate.

8. Once she returned to work in April 2006, Smith overheard a nurse say, "If she's unhappy here, why does she come back?" Another nurse responded, "Just like a dog, you beat them and abuse them, they still come back. Just like any good runaway slave would." (Id. at 38.) Smith reported the incident to Pousard; however, no corrective action was taken.

9. When Smith and an ER technician were discussing skin care, Smith suggested to the technician that she could use a certain facial cleanser to help with acne, and the technician replied, "People can't see yours because you're black." (Id.)

10. At one point, a coworker referred to Smith as "gal." The coworker told Smith that she called everyone "gal." Smith informed the coworker that the word reflected racial animosity. (Id. at 40-41.)

11. After overhearing Smith and a hospital volunteer from Somalia discussing ethnic foods and employment positions at Fairview, Smith's coworker told the volunteer that what she and Smith were discussing was inappropriate. Smith reported the incident to Pousard; however, no corrective action was taken.

12. Teyona Brown, an African-American coworker, testified that she overheard two white employees referring to Smith and stating, "She needs to go back to the ghetto where she came from." (Appellant's Supp. App. 59.)

The district court granted Fairview's motion for summary judgment as to all of Smith's claims. With regard to the hostile work environment claim, the court "examin[ed] the totality of the circumstances" and held that, assuming all of Smith's claims were true, the alleged harassment was not sufficiently severe or perversive as to affect a term, condition, or privilege of Smith's employment. As to Smith's retaliation claim, the court held that Smith was unable to demonstrate more than temporal proximity between her NCAs and the complaints about her coworkers' discriminatory behavior. Finally, with regard to constructive discharge, the court noted that Smith presented no evidence that Fairview intended to force her to resign. Smith brings this appeal, arguing that the district court erred in granting summary judgment in favor of Fairview on all three claims.

## II.

We review the district court's grant of summary judgment de novo. See Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1055 (8th Cir. 2007). "[S]ummary judgment should be granted in employment discrimination cases only if the evidence could not support any reasonable inference of discrimination," and we should affirm "if there is no genuine issue of material fact and [Fairview] is entitled to judgment as a matter of law." Id. However, we have previously noted that "summary judgment should be used sparingly in the context of employment discrimination and/or retaliation cases where direct evidence of intent is often difficult or impossible to obtain." Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1117 (8th Cir. 2006); see also Torgerson v. City of Rochester, 605 F.3d 584, 593 (8th Cir. 2010) (collecting cases stating same). Indeed, summary judgment is an improper remedy in "very close" employment discrimination cases. Kehoe v. Anheuser-Busch, Inc., 995 F.2d 117, 120 (8th Cir. 1993). Notwithstanding this point, "no separate summary judgment standard exists for discrimination or retaliation cases and . . . such cases are not immune from summary judgment." Wallace, 442 F.3d at 1118.

A. Hostile Work Environment

Title VII prohibits a racially hostile work environment. 42 U.S.C. § 2000e-2(a)(1) (prohibiting an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race"). A hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quotation omitted). The hostile work environment standard contains both a subjective and an objective component, thus, Smith is required to make a showing of a working environment "that a reasonable person would find hostile or abusive, and one that [she] in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) (citing Harris, 510 U.S. at 21-22). Among other things, to establish a prima facie case of a hostile work environment, Smith must demonstrate that "the harassment affected a term, condition, or privilege of [her] employment." Elnashar, 484 F.3d at 1058.

The district court stated it considered the totality of the circumstances. Smith contends, however, that the district court improperly reviewed each incident of racial hostility as an isolated event, instead of analyzing the cumulative effects of the instances of alleged discrimination. In reviewing on appeal the grant of summary judgment to Fairview on Smith's hostile work environment claim, we apply a de novo standard of review, and thus, we are not bound by the district court's method of analysis. See Elnashar, 484 F.3d at 1055 (standard of review). Further, while Smith is correct that "[w]orkplace conduct is not measured in isolation; [and] 'whether an environment is sufficiently hostile or abusive' must be judged 'by looking at all the circumstances,'" Bowen v. Mo. Dep't of Social Servs., 311 F.3d 878, 884 (8th Cir. 2002) (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001) (per curiam)), it is also true that only incidents that "have a racial character or purpose" can

support Smith's claim. <u>Singletary v. Mo. Dep't of Corrs.</u>, 423 F.3d 886, 893 (8th Cir. 2005) (quotation omitted). The stringent hostile work environment standard is designed to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language . . . and occasional teasing." <u>Faragher</u>, 524 U.S. at 788 (quotation omitted); <u>see</u> <u>Joens v. John Morrell & Co.</u>, 354 F.3d 938, 941 (8th Cir. 2004) (noting that Title VII does not "create a federal remedy for all offensive language and conduct in the workplace") (quotation omitted)).

1.

Several of the allegations made by Smith—the comments regarding Smith's lunch, acne, and ability to speak Spanish; the coworker's comment about Smith's conversation with the Somali volunteer; and the image on <u>The Onion</u>—at most only tenuously relate to race. In fact, Smith "offers little more than speculation and conjecture" that these incidents "had anything to do with race." <u>Anderson v. Durham D&M, LLC</u>, 606 F.3d 513, 519 (8th Cir. 2010) (quotation omitted). Because no "reasonable person would find [these events] hostile or abusive," <u>Faragher</u>, 524 U.S. at 787, we hold that those allegations do not corroborate Smith's claim that she suffered from a hostile work environment even as they are considered in the totality of the circumstances of Smith's work environment.

To support its conclusion that the district court erred in granting summary judgment, the dissent primarily relies on <u>Bowen</u>, a case it characterizes as analogous to this one. The dissent states that in <u>Bowen</u>, we "reviewed other allegations which were not overtly racial" and included those allegations when deciding that "there was enough evidence for a jury to consider whether the accumulation of the conduct was severe enough to alter a term of the plaintiff's employment." This analogy of our holding in <u>Bowen</u> to this case, however, is misleading, and further review of the facts of the <u>Bowen</u> case will demonstrate why.

In that case, the plaintiff, Wanda Bowen, was hired as a case manager for the Missouri Department of Social Services. Bowen, 311 F.3d at 880. Her immediate supervisor was Francine Lee. From the beginning of Bowen's employment, Bowen and Lee had an acrimonious relationship. As Bowen was leaving work after one especially hostile work day, she said "Good night, Francine," and Lee responded, "You kiss my ass, you white bitch!" Id. at 881. Following that incident, Bowen was assigned to another supervisor, but continued to work in close proximity to Lee. Thereafter, Bowen endured "hostile stares" from Lee "[o]n a near daily basis." Id. When Lee learned that Bowen had brought a cake to work to share with others, Lee threw the cake on the floor, stepped on it, and said to a nearby coworker, "You can damn well tell her that I did it." Id. When Bowen's new supervisor complained to Lee about Bowen, Lee referred to Bowen as a "menopausal white bitch" then Lee immediately threatened Bowen with physical harm and ran towards Bowen, chasing her back to her cubicle. Id. at 881-82.

The dissent argues that these "other allegations"—Lee's hostile stares at Bowen, Lee's destruction of Bowen's cake, Lee's threat of physical harm, and Lee's running at Bowen—lacked an "overtly racial" character but were considered in the determination of "whether the accumulation of the conduct was severe enough to alter a term or the plaintiff's employment."

It is not the role of the courts to consider incidents in isolation, rather we are to consider "all of the circumstances" of the workplace environment. Nor, however, are we to develop a nexus among isolated incidents where no such nexus exists. See Bradley v. Widnall, 232 F.3d 626, 632 (8th Cir. 2000) (affirming district court's grant of summary judgment on hostile work environment claim where plaintiff "was unable to provide any evidence of a nexus between the alleged harassment and her protected status"). This is what distinguishes Bowen from this case. In Bowen, the "other allegations" had a nexus to overt racism as all of the "other allegations" were actions by the same coworker who had called the plaintiff a "white bitch." Further, two of the

"other allegations"—the physical threat and the running towards the plaintiff—happened within seconds of the coworker referring to the plaintiff as a "menopausal white bitch."

The dissent also cites Diaz v. Swift-Eckrich, Inc., 318 F.3d 796 (8th Cir. 2003), and Hathaway v. Runyon, 132 F.3d 1214 (8th Cir. 1997), as cases where the court considered incidents that did not demonstrate an overt racial animus in determining if a plaintiff was subjected to a hostile work environment. These cases, like Bowen, are readily distinguishable. In Diaz, we held the various instances of "rude noises, laughter, and statements that [plaintiff] was stupid" to be "part of a course of conduct which [was] tied to evidence of discriminatory animus" because the offensive actions, which included two physical assaults, came from coworkers who had made "early comments . . . demean[ing] Hispanics and specifically referr[ing] to both Hispanics and [the plaintiff] as 'stupid.'" 318 F.3d at 800 (quotation omitted). In Hathaway, the plaintiff experienced "snickers and noises"—which were described as a "purring or growling noise made in the throat"—"for a period of eight months." 132 F.3d at 1217, 1222. These offensive sounds came from a coworker and the coworker's friend after the coworker had made physical sexual advances toward the plaintiff such as "hit[ting] [the plaintiff] on the buttocks with a clipboard" and "approach[ing] [the plaintiff] from behind and squeez[ing] her buttocks while she was waiting for an elevator." Id. at 1217.

In this case, several incidents that Smith argues support her claims of a racially hostile work environment—the comments regarding Smith's lunch, acne, ability to speak Spanish; the coworker's comment about Smith's conversation with the Somali volunteer; and the image on The Onion—have no obvious or overt racial animus. Further, unlike in Bowen, Diaz, and Hathaway, the incidents have no connection to or nexus with an obvious or overt racial incident as they lack any congruency of person or incident. These various allegations are "isolated incidents" that the Supreme Court has held "will not amount to discriminatory changes in the terms and conditions

-11-

of employment." Faragher, 524 U.S. at 788 (quotation omitted). For that reason, although considered as part of the "the totality of the circumstances," these incidents do not give rise to a change in Smith's terms or conditions of her employment.

2.

The picture of Buckwheat, the comment about fried chicken, and the reference to the ghetto, although not all shown or recited directly to Smith, carry some inferences that they were racially motivated, especially considering the context of the events. See, e.g., Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 348 (5th Cir. 2007) (stating that references to "ghetto children" were "perhaps racially inappropriate"); Simmons v. Océ-USA, Inc., 174 F.3d 913, 915 (8th Cir. 1999) ("The term 'Buckwheat' is a racial slur when it is directed towards a black employee in the context of an employment relationship."). Furthermore, the evidence clearly indicates that Smith experienced unwelcome racial harassment when exposed to several comments that were explicitly racial in nature. Specifically, the material on the website getoffended.com, the comment regarding "black aides," and the references about runaway slaves unambiguously permit an inference of racial animus. See,e.g., Canady v. Wal-Mart Stores, Inc., 440 F.3d 1031, 1035 (8th Cir. 2006) (noting that "in certain contexts, the term 'slave driver' could be considered evidence of racial animus"); Galdamez v. Potter, 415 F.3d 1015, 1024 n.6 (9th Cir. 2005) (noting that "there are no 'talismanic expressions' of racial animus necessary to sustain a harassment claim," and noting that "racially charged 'code words' may provide evidence of discriminatory intent by 'send[ing] a clear message and carry[ing] the distinct tone of racial motivations and implications.'" (quoting McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1117 (9th Cir. 2004))); Gipson v. KAS Snacktime Co., 171 F.3d 574, 579 (8th Cir. 1999) (inference of racial animus permissible after a "racially-tinged comment" that referred to someone in terms of "your kind"). Notwithstanding the inappropriate nature of these events, when viewing the totality of circumstances, including (1) "the frequency and severity of the discriminatory conduct," (2) "whether

such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance," and (3) "whether the conduct unreasonably interfered with the employee's work performance," Vajdl v. Mesabi Acad. of Kidspeace, Inc., 484 F.3d 546, 551 (8th Cir. 2007), we agree with Fairview's assertion that the evidence does not "satisfy the high threshold of actionable harm" necessary to constitute a hostile work environment, Elmahdi v. Marriott Hotel Servs., Inc., 339 F.3d 645, 653 (8th Cir. 2003) (quotation omitted).

First, the incidents were relatively infrequent, occurring over the span of Smith's 12 months of active employment in the ER. See Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 759-60 (8th Cir. 2004) (finding that racial remarks that were "sporadic, no more than one per month," over a period of two years, some of which were "merely overheard by [the employee]" were not "so severe or pervasive [to] alter[] the terms or conditions of his employment"); Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981) ("More than a few isolated incidents of harassment must have occurred. Racial comments that are merely part of casual conversation, are accidental, or are sporadic do not trigger Title VII's sanctions."). But see Delph v. Dr. Pepper Bottling Co. of Paragould, Inc., 130 F.3d 349, 352, 354 (8th Cir. 1997) (upholding hostile work environment claim where the plaintiff had been subjected to "a steady barrage of racial name-calling at the [defendant's] facility"); Ways v. City of Lincoln, 871 F.2d 750, 754-55 (8th Cir. 1989) (upholding a finding of a hostile work environment where the plaintiff had identified approximately 50 examples of racial harassment).

Next, although we look to the frequency of harassment, it is but one factor of our analysis and even infrequent conduct can be actionable if severe enough. See Bowen, 311 F.3d at 884-85. The severity of the conduct here does not rise to the requisite level needed to establish a hostile work environment. Most of the events involved conduct that was not particularly severe, involved coworkers as opposed to Smith's direct supervisors, and could only be considered non-actionable, "mere

offensive utterance[s]." Singletary, 423 F.3d at 893; see Nitche v. CEO of Osage Valley Elec. Coop., 446 F.3d 841, 846 (8th Cir. 2006) ("To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant."); Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999) (noting that we also consider the "physical proximity to the harasser, and the presence or absence of other people"). In fact, the record is void of "any of the physically threatening or intimidating behavior that we have found important in some actionable cases." Anderson, 606 F.3d at 520 (citing Reedy v. Quebecor Printing Eagle, Inc., 333 F.3d 906, 909-10 (8th Cir. 2003) (finding hostile work environment when a death threat was involved)); Bowen, 311 F.3d at 885 ("Lee's serious misconduct and Bowen's subjective fear of bodily harm adequately demonstrate, for summary judgment purposes, that Lee's conduct was both objectively and subjectively hostile or abusive.").

In sum, the totality of the evidence, taken in the light most favorable to Smith, does not support Smith's contention that her workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter" her conditions of employment, and thus, Smith has not successfully established a hostile environment claim. See Harris, 510 U.S. at 21. We conclude that, although many of the coworkers' "racially tinged" comments and actions were "ill-chosen," and "however ill-advised [their] attempts at racial humor, [the] conduct did not give rise to an actionable claim of racial hostility." Canady, 440 F.3d at 1035.

## B. Constructive Discharge

Although she resigned, Smith may bring a Title VII claim against Fairview as long as she properly establishes constructive discharge. See O'Brien v. Dep't of Agri., 532 F.3d 805, 810 (8th Cir. 2008). To do so, Smith must show that she "subjectively perceive[d] the environment to be abusive" and that "a reasonable person would have found the conditions of employment intolerable and that [Fairview] either intended to force [her] to resign or could have reasonably foreseen

-14-

that [she] would do so as a result of its actions." Fenney v. Dakota, Minn. & E. R.R., 327 F.3d 707, 717 (8th Cir. 2003) (quotations omitted). This is a "substantial" burden as the "bar is quite high" in these cases. O'Brien, 532 F.3d at 810-11 (quotations omitted). Because we have already concluded that Smith has not successfully shown that her hostile work environment claim should have survived summary judgment, her constructive discharge claim also fails. See Penn. State Police v. Suders, 542 U.S. 129, 146-47 (2004) ("A hostile environment constructive discharge claim entails something more [than an actionable hostile work environment]."); O'Brien, 532 F.3d at 811 ("[Plaintiff] premises her constructive discharge claim on the same allegations we found insufficient to establish a hostile work environment. As such, her claim fails.").

## C. Retaliation

Smith alleges that Fairview retaliated against her for complaining of her coworkers' discriminatory behavior by disciplining her with the three NCAs. "Title VII prohibits retaliation against an employee who files charges of discrimination." Thompson v. Bi-State Dev. Agency, 463 F.3d 821, 826 (8th Cir. 2006); accord 42 U.S.C. § 2000e-3(a). Because Smith did not present any direct evidence of retaliation, we apply the burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which requires that Smith first present a prima facie case of retaliation. See Hughes v. Stottlemyre, 506 F.3d 675, 678-79 (8th Cir. 2007), cert. denied, 128 S. Ct. 1741 (2008). Establishing a prima facie case of retaliation to defeat summary judgment requires a showing that: "(1) [the plaintiff] engaged in statutorily protected activity; (2) an adverse employment action was taken against [the plaintiff]; and (3) a causal connection exists between the two events." Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 914 (8th Cir. 2006) (quotation omitted). As the district court assumed that Smith satisfied the first two elements of her prima facie case, and because Fairview makes no argument otherwise, we limit our discussion to the third prima facie element.

To establish the requisite causal connection, Smith relies almost exclusively on the temporal proximity between her complaints of discrimination and her receipt of the NCAs. Although "[a]n inference of a causal connection between a charge of discrimination and termination can be drawn from the timing of the two events," generally "more than a temporal connection is required to present a genuine factual issue on retaliation." Peterson v. Scott Cnty., 406 F.3d 515, 524 (8th Cir. 2005).

"The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." Breeden, 532 U.S. at 273 (quotation omitted). We have held that a two-week period of time was close enough to establish causation. See Smith v. Allen Health Sys., Inc., 302 F.3d 827, 833 (8th Cir. 2002) ("[The plaintiff's] family leave began on January 1 and [the superior] discharged [the plaintiff] on January 14. These two events are extremely close in time and we conclude that under our precedent this is sufficient, but barely so, to establish causation, completing [the plaintiff's] prima facie case."); Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1113-14 (8th Cir. 2001) (noting that a "matter of weeks" between a protected activity and an adverse employment action was sufficient to complete a prima facie case of discrimination). But see Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (noting that a two-month interval between the employee's termination and her retaliation complaint, by itself, was not enough to establish a causal connection as a matter of law). Here, the temporal proximity between Smith's complaints of discrimination, EEOC filing, and her receipt of the NCAs is tenuous at best, as the shortest interval between any of them is approximately one month. Absent any additional evidence of causation, we conclude that Smith has failed to establish this element of her prima facie case of retaliation.

Even if the temporal proximity was enough to establish a prima facie case of retaliation, Fairview offered legitimate, nondiscriminatory reasons for giving Smith

-16-

the NCAs.  Once a plaintiff establishes a prima facie case of retaliation, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action."  Macias Soto v. Core-Mark Int'l, Inc., 521 F.3d 837, 841 (8th Cir. 2008).  If the defendant presents such a reason, the plaintiff must prove that it is a pretext for retaliation.  Id.

All of Smith's NCAs reflect legitimate, employment-related concerns and do not reflect false accusations or evidence that Fairview inappropriately papered Smith's file with minor infractions.  See Kim v. Nash Finch Co., 123 F.3d 1046, 1061 (8th Cir. 1997) (holding that a "jury could have reasonably found that [the employer] placed the written reprimand[s] in [the employee's] personnel file in order to discredit [the employee] when [there was an investigation of] his employment discrimination charge").  Thus, the burden shifts to Smith to present evidence of pretext, and she has failed to do so.  Smith attempts to establish pretext by asserting that she was disciplined more severely than her coworkers.  Smith claims that she was treated unfairly when she was given the NCAs for her performance, while her coworkers faced no disciplinary actions for their discriminatory behavior towards her.  While "[i]nstances of disparate treatment can support a claim of pretext, . . . [Smith] has the burden of proving that she and [her coworkers] were similarly situated in all relevant respects."  King v. Hardesty, 517 F.3d 1049, 1063 (8th Cir. 2008) (quotation omitted); see also Putman v. Unity Health Sys., 348 F.3d 732, 733-34 (8th Cir. 2003) (noting that to establish pretext, a plaintiff must "substantiate [her] allegations with sufficient probative evidence [that] would permit a finding in [her] favor based on more than mere speculation, conjecture, or fantasy").  Smith has produced no evidence that her coworkers were "involved in or accused of the same offense and [were] disciplined in different ways," thus she has not shown that she and her coworkers "were similarly situated in all relevant aspects."  King, 517 F.3d at 1063 (quotation omitted).  Therefore, Smith's retaliation claim fails. In conclusion, the district court properly granted summary judgment to Smith on her retaliation claim.

-17-

IV.

Accordingly, we affirm the district court's judgment.

BYE, Circuit Judge, concurring in part and dissenting in part.

I concur in the opinion of the Court except with respect to Part II.A, which concludes Shelia Smith did not present sufficient evidence to create a genuine issue of material fact on her hostile work environment claim. Because I believe her complaint and the record each do indeed support such a claim, I respectfully dissent.

As the majority notes, "[s]ummary judgment should be granted in employment discrimination cases only if the evidence could not support any reasonable inference of discrimination" and should only be affirmed if the employer is entitled to judgment as a matter of law. Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1055 (8th Cir. 2007).

The fourth element of a hostile work environment claim under Title VII requires the plaintiff to provide sufficient evidence showing "the harassment affected a term, condition, or privilege of his employment." Id. at 1058. In order to satisfy this prong, Smith must provide sufficient evidence that she reasonably perceived the racial harassment was "severe or pervasive." Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993). However, she does not need to show there was a physical manifestation of the harm, so long as there is evidence the working environment was affected in some way. Id. at 21. In deciding whether this element is satisfied, courts must look at "all the circumstances" to determine "whether an environment is sufficiently hostile or abusive." See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001). The majority concludes Smith did not present sufficient evidence "the harassment affected a term, condition, or privilege of [her] employment." Elnashar, 484 F.3d at 1058. I disagree.

-18-

I believe the district court improperly reviewed incidents of racial hostility by separating Smith's allegations into three categories instead of viewing the "totality of the circumstances." Anderson v. Durham D&M, L.L.C., 606 F.3d 513, 519 (8th Cir. 2010). At summary judgment, the district court categorized the incidents alleged by Smith into three groups.[6] In doing so, the court looked at each allegation of harassment in isolation instead of looking at "the accumulation of abusive conduct" to make its summary judgment determination. See Hathaway v. Runyon, 132 F.3d 1214, 1222 (8th Cir. 1997). It is necessary that courts look at "all the circumstances," including those which are not explicitly racial in nature, when analyzing allegations of workplace harassment. Breeden, 535 U.S. at 270. See also Hathaway, 132 F.3d at 1222 ("Not every aspect of a work environment characterized by hostility and intimidation need be explicitly sexual in nature to be probative.").[7] In this case, the majority focuses its analysis only on the most flagrant instances of racial animus to the exclusion of numerous other incidents. In prior cases, however, when there was evidence of overt harassment, we looked at all allegations, not just the incidents demonstrating overt racial animus, to determine whether the incidents were frequent or severe enough to affect a term, condition, or privilege of employment. See Diaz v. Swift-Eckrich, Inc., 318 F.3d 796, 799 (8th Cir. 2003) (finding a triable issue of fact on whether harassment altered a term of employment where evidence was presented

---

[6]The categories were (1) incidents tenuously related to race and not evincing racial animus; (2) incidents giving rise to an inference that they were racially motivated; and (3) incidents demonstrating overt racial animus.

[7]The majority cites Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) for the proposition that the stringent hostile work environment standard is designed to "filter out complaints attacking the ordinary tribulations of the workplace." However, this language refers to the claim as a whole instead of specific incidents reviewed piecemeal. The Supreme Court clearly articulated the sufficiency of a claim is judged "by looking at all the circumstances" and not only reviewing the allegations found to be explicit harassment. Id.

of overtly racial remarks along with actions such as making "rude noises, laughter, and statements that [plaintiff] was 'stupid'"); Eich v. Bd. of Regents for Cent. Mo. State Univ., 350 F.3d 752, 759 (8th Cir. 2003) ("The humiliating and intimidating effect of the snickers and noises on [plaintiff] could have been interpreted by the jury to be caused by the nexus between that behavior and [the harasser's] earlier sexual overtures."); Bowen v. Mo. Dep't of Soc. Servs., 311 F.3d 878, 884 (8th Cir. 2002) (finding a few explicitly racial actions coupled with frequent hostile stares sufficient to create a triable issue of fact on whether the conduct altered a term of employment); Hathaway, 132 F.3d at 1222 (finding that other acts in the workplace can be used as a nexus with overt acts of harassment to establish a prima facie case).[8] Since it is essential to a hostile work environment claim to show that conduct is either "severe or pervasive," the district court failed to acknowledge other allegations can form the nexus to establish a prima facie case. See Hathaway, 132 F.3d at 1222. As such, I believe the district court improperly reviewed the allegations as isolated events instead of considering "the accumulation of the abusive conduct." Id.

In viewing the totality of the circumstances, I would conclude Smith created a trial-worthy issue on whether the harassment Smith alleges altered a term, condition, or privilege of employment. My review of the record leads me to conclude Smith produced sufficient evidence to create a fact issue as to whether "the cumulative effect" of the workplace harassment was "severe or pervasive" to support her claim. See Bowen, 311 F.3d at 885.

---

[8]The majority states that only instances which "have a racial character or purpose" can be used to support a hostile work environment claim. Singletary v. Mo. Dep't of Corrs., 423 F.3d 886, 893 (8th Cir. 2005). However, as recognized in Diaz, Eich, Bowen, Hathaway, and other cases, whether a particular incident is racial in character is a question properly submitted to the jury, so long as the evidence as a whole permits such an inference.

The facts in this case are similar to those in <u>Bowen</u>, where an employee suffered overt racial harassment on a few occasions. <u>Id.</u> The incidents included: (1) a co-worker calling plaintiff a "white bitch" and a "menopausal white bitch;" and (2) other employees telling the plaintiff that the co-worker did not like white people. <u>Id.</u> We also reviewed other allegations which were not overtly racial. <u>Id.</u> Such incidents included: (1) the co-worker throwing a cake which the plaintiff made on the floor; (2) hostile stares by the co-worker toward the plaintiff; (3) the co-worker making threats of physical beating; and (4) the co-worker running at the plaintiff. <u>Id.</u> All of these incidents occurred within the plaintiff's two years of employment. <u>Id.</u> We found that although the "conduct towards [plaintiff] was not frequent, neither was it infrequent" and there was enough evidence for a jury to consider whether the accumulation of the conduct was severe enough to alter a term of the plaintiff's employment. <u>Id.</u>

Comparing Smith's case to <u>Bowen</u>, some of the harassment endured by Smith was overtly racial. For example, (1) the picture of Buckwheat posted with other employees' childhood photographs with a caption saying "Guess who this is?"; (2) employees stating Smith "needs to go back to the ghetto;" (3) overtly racist t-shirts displayed for Smith by other employees on getoffended.com; (4) a nurse stating "these black aides don't know what they are doing;" and (5) a nurse stating "[j]ust like a dog, you beat them and abuse them, they still come back. Just like any good runaway slave." Like <u>Bowen</u>, Smith also alleged incidents which were not explicitly racial. Incidents included: (1) a co-worker stating Smith's conversation with a Somali volunteer about ethnic food was "inappropriate;" (2) co-workers showing Smith the image of three people who appeared to be African-American on <u>The Onion</u> with the caption "Show us your tits for emergency rations;" (3) Smith bringing ethnic food to work and a co-worker stating that "crap in [the co-workers] garbage" smelled better; (4) a co-worker commenting that "[p]eople can't see [Smith's acne] because [she's] black;" and (5) a co-worker's comment on Smith's ability to speak Spanish. The determination of whether the sum of the incidents alleged by Smith create a hostile work environment should be left to the fact-finder because "[o]nce there is evidence

of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury." Howard v. Burns Bros., Inc., 149 F.3d 835, 840 (8th Cir. 1998). Viewing the allegations together, I would conclude the evidence presented by Smith creates a "reasonable inference" that the cumulation of racial animus altered a term of Smith's employment.

In attempting to distance this case from the holding in Bowen and other similar cases, see Diaz, 318 F.3d 796; Hathaway, 132 F.3d 1214, the majority attempts to read into the hostile work environment claim a requirement that all incidents of mistreatment possess "congruency of person or incident." Ante at 11. Whatever the precise meaning of this requirement, imposing this additional burden on plaintiffs in hostile work environment cases is not supported by law. Although it is true that plaintiffs must establish a causal nexus between the harassment and their membership in the protected group and, separately, appreciable effect of harassment incidents on a term, condition, or privilege of their employment, no cases require them to establish that all harassment emanated from the same individual or occurred immediately following the most palpable instances of harassment.

Even to the extent the majority interprets the law to require "congruency of person or incident" to explain why some seemingly innocuous conduct has racial undertones to a particular plaintiff, application of this requirement to dismiss this case violates this court's obligation to view all the evidence in the light most favorable to the nonmoving party, see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and use summary judgment in employment discrimination cases sparingly, Wallace, 442 F.3d at 1117. Smith experienced several instances of harassment with varying degree of racial animus. But even with regard to the least culpable of these instances, which were classified by the district court as "tenuously related" to race, a rational trier of fact could conclude they were related to Smith's membership in the protected group. The point is that the court cannot completely disregard these instances merely because they are not the strongest card in the

plaintiff's hand. For fear of consider weaker incidents "in isolation," the majority completely disregards them. Rather than draw its own conclusions on how offensive or racially insensitive these instances are to a reasonable person, the majority must leave this task to the jury.

The majority also cites <u>Anderson</u> for the proposition the harassment alleged by Smith was not severe because it is void of "physically threatening or intimidating behavior." 606 F.3d at 520. However, particularly egregious examples of harassment should not mark the boundary of actionable harm. <u>See</u> <u>Harris</u>, 510 U.S. at 22 (holding the most egregious examples do not determine when an environment is sufficiently hostile or abusive). Additionally, the severity of a work environment should not simply be measured by a single event which is extreme in nature, but also by the cumulation of abusive conduct toward an employee. <u>See</u> <u>Hathaway</u>, 132 F.3d at 1222. There is clear evidence that Smith was harassed on several occasions because of her race. Since this is certainly offensive conduct, the assessment of whether the harassment created a hostile work environment should be left in the hands of the jury. <u>See</u> <u>Howard</u> 149 F.3d at 884.

In sum, I believe the evidence provided by Smith is sufficient to create a jury question on whether the harassment at her workplace altered a term of her employment. Therefore, I would reverse the district court's grant of summary judgment to Fairview on Smith's hostile work environment claim, and remand this case for trial.

_____