# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1758

_____

| | |
|---|---|
| Richard Anderson, | * |
| | * |
| Appellant, | * |
| | * |
| v. | * Appeal from the United States |
| | * District Court for the |
| Durham D&M, L.L.C., | * Western District of Missouri. |
| | * |
| Appellee. | * |
| _____ | * |
| | * |
| Equal Employment | * |
| Opportunity Commission, | * |
| | * |
| Amicus Curiae | * |
| on behalf of Appellant. | * |

_____

Submitted: December 15, 2009
Filed: May 26, 2010

_____

Before RILEY, Chief Judge,[1] WOLLMAN and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

_____

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

Richard Anderson appeals the district court's grant of summary judgment to Durham D& M, L.L.C. ("Durham") on his claims of race discrimination under Title VII and 42 U.S.C. § 1981, age discrimination under the Age Discrimination and Employment Act ("ADEA"), and a racially hostile work environment under § 1981.[2] The district court[3] granted summary judgment to Durham as to the race discrimination and the hostile work environment claims as a matter of law and determined Anderson failed to exhaust his administrative remedies as to the age discrimination claim. Considering the merits as to all claims, we affirm.

## I. Background

Durham is student-transportation provider that employed Anderson as a school bus driver at its Grandview, Missouri facility for several months in 2006 and 2007. Anderson is a white male who was approximately 73 years old when he started at the company. Operations Supervisor Faye Chapman interviewed and hired Anderson in August 2006. Thereafter, Anderson attended five days of training on Durham's policies, including harassment, discrimination, safety, and accidents.

Anderson's official hire date was September 5, 2006. The same day, an evaluator rode along with Anderson and gave him an overall written evaluation of

---

[2]Anderson also brought claims of retaliation under § 1981, Title VII, and the ADEA. The district court determined that Anderson had failed to exhaust remedies as to the Title VII and ADEA retaliation claims and granted summary judgment on the merits as to the § 1981 retaliation claim. Anderson made only passing reference to retaliation in his opening brief, and we consider any challenge to the district court's grant of summary judgment as to the retaliation claims waived. See United States v. Howard, 532 F.3d 755, 760 (8th Cir. 2008); Ahlberg v. Chrysler Corp., 481 F.3d 630, 634 (8th Cir. 2007).

[3]The Honorable Greg Kays, United States District Judge for the Western District of Missouri.

"needs improvement," the other option being "meets expectations." Chapman informed Anderson of the evaluation and told him that she wanted to observe his driving.

Anderson testified that, all together, Chapman rode with him during training and a couple of other times. She told him each time she did so that he was doing an "excellent" job and she ultimately gave him a "meets expectations" review. Chapman did not document any problems with his performance during ride-alongs.

Durham employed bus monitors and Chapman testified that monitors assigned to Anderson's bus came to her with specific concerns about Anderson's driving not long thereafter.[4] Viewing the record in the light most favorable to Anderson, it does not appear Chapman documented any complaints or discussed them with Anderson. Anderson's testimony indicates, however, that he became aware of at least one monitor's complaints about his driving.

In late September or early October, General Manager Daryl Huddleston told Anderson that he would have to take a driving test on October 5. Anderson has maintained that no one in management actually told him that he was driving poorly. He testified, however, that Huddleston asked him to take the driving test because "they said they had reports that my driving was bad" and that Huddleston told him about phone calls Durham had received concerning his driving. Anderson declined to take

---

[4]The record indicates several of Anderson's monitors complained to management about his driving at different times during Anderson's employment. Additionally, Durham submitted an affidavit from a child passenger who witnessed Anderson fall asleep and complained to a monitor. Anderson has generally denied driving poorly and making many of the mistakes cited by Durham employees and third parties. He has offered no evidence, however, to dispute that management actually received complaints and points instead to the lack of documentation about them if they in fact occurred.

the test and went home. Huddleston considered Anderson to have quit under company policy when Anderson did not return for three days.

In January 2007, Anderson approached Huddleston about taking the driving test. According to Huddleston, he consulted Chapman and Safety Supervisor Rodger McGee before allowing Anderson to do so. Chapman and McGee administered the test, and Chapman told Anderson that he did "great." Anderson also successfully passed medical, drug, and alcohol tests and was rehired as of January 18, 2007.

In March and April 2007, Anderson was involved in three accidents. According to the employee handbook, a "motor vehicle accident" includes any accident, including a collision with a fixed object, "that results in death, bodily injury, property damage or physical damage, regardless of the nature, extent, or dollar amount (i.e., $1 or more) of injury or damage." A motor vehicle accident is to be investigated, recorded, and reported to Risk Management. Preventable motor vehicle accidents count against the employee's work record, while non-preventable accidents do not. "An accident is considered preventable unless a subsequent investigation shows that our driver did everything possible, as an expert driver, to prevent it." The handbook describes steps to be taken by management upon each preventable accident, varying to some extent by the amount of time between accidents. An employee is terminated upon the third preventable accident in twenty-four months. However, "no employee is allowed a certain number of preventable accidents," and the company retains the right to determine appropriate "corrective action" for a preventable accident based on "cause, severity, injuries, damage, negligence, and the employee's safety record or other contributing factors."

On March 19 and April 4, Anderson hit curbs while driving. Marilyn Owens was acting as a monitor on those occasions and sought medical treatment for injuries allegedly sustained during both accidents. Durham deemed both accidents "preventable." On April 6, Anderson was exiting Durham's lot and broke a mirror on his bus while attempting to avoid another bus that had turned into his lane. Anderson

reported the incident and was instructed to continue on his route. Huddleston met with Chapman and McGee about the accidents and complaints they had received about Anderson's driving. According to Huddleston, he decided to remove Anderson as a driver and instructed McGee to tell Anderson he was being reassigned to a bus monitor position at the same rate of pay. Chapman and McGee met Anderson in the parking lot when he returned from his route, and McGee informed Anderson that he could no longer drive. Although Anderson now asserts that he was not offered a monitor position, he acknowledged during deposition that Chapman said he could serve as a monitor at a lower rate of pay. At that time, Anderson turned down the offer, left, and did not return to Durham. He stated, however, that he "probably" would have accepted the job had the pay been the same. McGee completed an incident report dated the same day deeming the accident preventable. The driver Anderson testified took over his routes is a white male older than Anderson. Anderson nonetheless maintains that he was terminated because of his race or age.

To that end, Anderson makes several broad assertions he was treated differently than younger, African American drivers. Generally, he contends that he was subjected to higher standards of performance. He testified that McGee constantly nitpicked his driving, but he did not know if McGee treated others more favorably. Anderson also stated in an affidavit, for example, that he heard supervisors discussing accidents "of a much more serious nature involving younger, black drivers that were still employed at Durham." Anderson additionally testified that he witnessed accidents and knew of one driver who had two accidents in a single day, though he did not know what happened to the driver. Anderson further alleged that African American drivers were given special charter routes over him. He acknowledged, however, that one of the charters conflicted with his regular route and that he was aware of Durham's policy not to schedule a driver for a charter if it conflicted with the driver's existing routes. He could not remember the circumstances of another charter route he did not receive.

In addition to the disparate treatment Anderson allegedly encountered, he maintains that he suffered ongoing verbal harassment from managers and employees

that started soon after he began working. Anderson testified that one of the reasons he did not come back after being asked to take the driving test was because of "the name calling and so forth" and because it was "not a good environment." He later acknowledged that he nevertheless suggested to his wife that she apply for a job at Durham.

Chapman and other employees frequently called Anderson names such as "fuzz ball" and "Spongebob Square Pants." He first testified that these names were age or race related. McGee, in addition to nitpicking Anderson's driving, often insulted and ridiculed him, which Anderson believed had to do with his race or his age. Anderson testified, however, that neither McGee nor Huddleston made any inappropriate remarks as to his race or age.

According to Anderson's testimony, a group of five to seven African American employees stood outside Durham's office and called him names as he passed by nearly every time he saw them for almost his entire employment. These individuals called him racial slurs, including at times "white bitch" and "cracker," on a number of occasions, as well as other profane names such as "motherf***er" and "a**hole" on a more regular basis. It is undisputed that he complained to Chapman at least once in fall 2006 that employees were calling him names. However, he acknowledged at deposition that he told her that the employees were "foulmouthed" and that he was being called names, but did not repeat the "dirty" words used or tell her the name calling was racially inappropriate. He also testified that Chapman was not outside when the name calling occurred; however, Anderson believed her presence in the office meant she must have heard the comments. Anderson did not tell any other manager about this behavior.

Shortly after Anderson started at Durham, one of his monitors, Marilyn Owens, began "constantly" making racial comments, including that she hated white people and wished she had a black driver. Anderson reported the remarks to Chapman during fall

2006. Chapman told him not to worry about Owens and that she would take care of it, though it does not appear she did anything immediately.

Anderson also testified that a different African American monitor, Pamela Johnney, told him that she would take his route as soon as she obtained her license. He did not recall if he reported the comment to Chapman. Employees also called him "old fart," but he did not complain to Chapman.

The record also contains documentation concerning alleged racially motivated incidents occurring after Anderson left Durham. Included are joint Missouri Department of Human Rights/EEOC charges filed by two white employees in 2008 with allegations of harassment and disparate treatment. One of these employees also completed a statement concerning an altercation she had with an African American employee and the use of racial slurs at Durham. Lastly, Durham records indicate that in summer 2008, Chapman was disciplined for making an inappropriate comment in front of employees and received training, including training on "diversity, harassment and discrimination."

## II. Discussion

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Johnson v. Ready Mixed Concrete Co., 424 F.3d 806, 810 (8th Cir. 2005). "We review a district court's grant of summary judgment *de novo*, drawing all reasonable inferences, without resort to speculation, in favor of the nonmoving party." Id. "A genuine issue of material fact exists if a reasonable jury could return a verdict for the party opposing the motion." Humphries v. Pulaski County Special Sch. Dist., 580 F.3d 688, 692 (8th Cir. 2009) (quotation omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

A.    Racially hostile work environment

Courts apply the same standards to evaluate a hostile work environment claim under § 1981 as under Title VII.  Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1050 (8th Cir. 2002).  To sustain a claim for hostile work environment, "a plaintiff must show that (1) he or she is a member of a protected class; (2) he or she is subjected to unwelcome race-based harassment; (3) the harassment was because of membership in the protected class; and (4) the harassment affected a term, condition, or privilege of his or her employment."  Singletary  v. Mo. Dep't of Corr., 423 F.3d 886, 892 (8th Cir. 2005).  The workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive."  Id. (quotation omitted).  The environment must be both objectively hostile as perceived by a reasonable person and subjectively abusive as actually viewed by Anderson. Bowen v. Mo. Dep't of Soc. Servs., 311 F.3d 878, 883 (8th Cir. 2002).  In examining the objective component, we look to the totality of the circumstances, "including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance and whether the conduct unreasonably interfered with the employee's work performance."  Singletary, 423 F.3d at 893.  We also consider the "physical proximity to the harasser, and the presence or absence of other people."  Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999). Finally, when a plaintiff attempts to establish a hostile work environment based on the actions of co-workers, he or she "must then present evidence that the employer 'knew or should have known about the harassment and failed to respond in a prompt and effective manner.'"  Arraleh v. County of Ramsey, 461 F.3d 967, 969  (8th Cir. 2006) (citation omitted).

Hostile work environment claims must meet "demanding" standards and courts are to "filter out" those complaints concerning the "ordinary tribulations of the workplace."  Al-Zubaidy v. TEK Indus.,  Inc., 406 F.3d 1030, 1039 (8th Cir. 2005) (internal quotations and citation omitted).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes

-8-

in the terms and conditions of employment." <u>Arraleh</u>, 461 F.3d at 979. "Mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate § 1981." <u>Elmadhi v. Marriott Hotel Servs.</u>, 339 F.3d 645, 653 (8th Cir. 2003) (internal quotations, alteration, and citation omitted).

None of the actions by Durham managers establish a racially hostile work environment. Anderson "offers little more than speculation and conjecture" that Chapman's name calling and McGee's nitpicking and ridicule had anything to do with race.[5] <u>Palesch v. Mo. Comm'n on Human Rights</u>, 233 F.3d 560, 567–68 (8th Cir. 2000). Nor has he shown this behavior was objectively severe enough to give rise to a claim. <u>See</u> <u>Helton v. Southland Racing Corp.</u>, 600 F.3d 954, 959–60 (8th Cir. 2010) (rude and demeaning conduct by supervisor insufficient); <u>O'Brien v. Dep't of Ag.</u>, 532 F.3d 805, 810 (8th Cir. 2008) (increased scrutiny insufficient on the record); <u>Bradley v. Widnall</u>, 232 F.3d 626, 631–32 (8th Cir. 2000) (frustrating work situation insufficient). We address additional allegations regarding managers' preferential treatment of African American employees below; for purposes here, however, we note only that none of the managers' actions were overtly racist and Anderson has produced insufficient evidence of disparate treatment to give rise to an inference that their actions were racially motivated.

We also conclude that Anderson cannot establish Durham's liability for a racially hostile work environment based on his fellow employees' conduct. On appeal, Anderson has primarily focused his arguments on the name calling by the group of African American employees who stood outside Durham's office. Even assuming the conduct was objectively severe, we agree with Durham that there is insufficient evidence management was aware of the racial nature of the harassment. The record does not establish that any manager was physically present when the name calling occurred; any subjective belief on Anderson's part that Chapman heard the language from the office

---

[5]The same is true regarding Anderson's belief that names like "fuzz ball" or "Spongebob" had to do with age.

cannot defeat summary judgment on this point. Anderson acknowledged that he told Chapman he was being called names and that the employees were "foulmouthed." He has failed to point to any evidence indicating that he even suggested to her these comments were racially motivated. See Jacob-Mua v. Veneman, 289 F.3d 517, 523 (8th Cir. 2002) (affirming summary judgment where plaintiff failed to "declare, indicate, or even imply that the incident had anything to do with race"). Even considering Anderson's testimony that he complained to Chapman about Owens's racial comments, we cannot say on this record that Chapman should have realized that the name calling, by different employees under dissimilar circumstances, was racially motivated as well. Nor has he shown that such harassment was so widespread during his employment that Durham should have known about the racial nature of the harassment for that reason either. Cf. Hall v. Gus Constr. Co., Inc., 842 F.2d 1010, 1015–16 (8th Cir. 1988).

As noted, Owens, Anderson's monitor, allegedly made repeated racial comments during Anderson's short employment of which Chapman was aware; however, "the frequency of the alleged harassment is only one of the relevant factors" we consider in determining whether harassment is objectively severe. From Anderson descriptions of his interactions with her, we cannot detect any of the physically threatening or intimidating behavior that we have found important in some actionable cases. See, e.g., Reedy v. Quebecor Printing Eagle, Inc., 333 F.3d 906, 909–10 (8th Cir. 2003); Bowen, 311 F.3d at 884–85. Anderson also acknowledged during deposition that at some point after his complaints to Chapman, Durham separated him from Owens.

Finally, we question, as did the district court, how subjectively severe Anderson considered the harassment to be, and Owens's in particular. Anderson voluntarily returned to Durham of his own accord after initially refusing to take the driving test. He also indicated that he would probably have remained at Durham after being removed as a driver had he been offered the same pay to serve as a monitor and acknowledged that suggested that his wife apply for a job at Durham. This evidence indicates that while this conduct may have certainly offended Anderson, it did not subjectively alter the conditions of his employment.

-10-

B.  Race discrimination

"We apply the same analysis to claims of discrimination under Title VII and 42 U.S.C. § 1981."  Takele v. Mayo Clinic, 576 F.3d 834, 838 (8th Cir. 2009). In the absence of direct evidence of discrimination, we employ the burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), to evaluate Anderson's claims.[6]  Humphries, 580 F.3d at 692.  Anderson can establish a prima facie case of race discrimination by showing that (1) he is a member of a protected class; (2) he was qualified for the position (sometimes articulated as meeting the employer's legitimate expectations); (3) he suffered an adverse employment action; (4) under circumstances permitting an inference that the action was a result of unlawful discrimination. Id. The burden then shifts to Durham "to establish a legitimate, nondiscriminatory reason for taking the allegedly discriminatory action." Id. at 692–93 (quotation omitted).  "If [Durham] puts forth such a reason, [Anderson] must then show that [Durham's] proffered explanation is pretextual or his claims will fail." Id.  He may do so by "adduc[ing] enough admissible evidence to raise genuine doubt as to the legitimacy of [Durham's] motive." Sprenger, 253 F.3d at 1110 (quotation omitted). The district court held that Anderson failed to establish a prima facie case,[7] and that

_____

[6]Anderson argues the district court failed to recognize direct evidence of racial discrimination and erred by analyzing his claims under McDonnell Douglas, rather than under the mixed-motive analysis of PriceWaterhouse v. Hopkins, 490 U.S. 228 (1990).  However, Anderson failed to raise the mixed-motive theory below, and thus Anderson's arguments are not properly before this court.  Cronquist v. City of Minneapolis, 237 F.3d 920, 924–25 (8th Cir. 2001).  Based on the parties' submissions, the district court reasonably assumed that they agreed McDonnell Douglas applied, and we will not entertain these arguments for the first time on appeal. Id.

[7]The district court reasoned in part that Anderson had not established he was qualified for the position because he could not show that he was meeting the employer's legitimate job expectations of driving a bus safely.  We have recently recognized that a tension appears to exist in our case law as to what a plaintiff must

-11-

even if he had, he could not show Durham's reason for terminating him as a driver—his unsafe record as a whole—was pretextual. Even assuming Anderson could establish a prima facie case, we agree the claim fails on the third prong of the analysis.

"At [the] final stage of the analysis, [Anderson's] burden merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." Dixon v. Pulaski County Sch. Dist., 578 F.3d 862, 868 (8th Cir. 2009) (quotation omitted). We consider "evidence used to support the prima facie case along with other evidence before the court to determine whether a whether there exists a triable fact on the ultimate issue of discrimination." Id. (quotation omitted). We have observed that there are "at least two routes" for demonstrating a material question of fact as to pretext. Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006). First, a plaintiff may succeed "indirectly" by showing the proffered explanation has "no basis in fact." Id. (quotation omitted). Second, a plaintiff can "directly" persuade the court that a "prohibited reason more likely motivated the employer." Id. (quotation omitted). Anderson maintains that he presented evidence that Durham's proffered reason was false, and that he can, in any event, succeed under the second route. We disagree.

Anderson claims disparate treatment from similarly situated employees, most notably in that he was disciplined and ultimately terminated for minor accidents to which management turned a blind eye when committed by African Americans. He has not, however, identified any specific individual who received preferential treatment or otherwise provided sufficient detail that would permit us to determine whether these individuals were in fact similarly situated to him. In order for disparate treatment to be probative of pretext, Anderson must show that he was similarly situated to more leniently treated employees in "all relevant respects" — a "rigorous" standard at the

_____

establish regarding qualifications at this stage of the analysis. See Elam v. Regions Fin. Corp., 2010 WL 1526450, at *5 n.4 (8th Cir. Apr. 19, 2010). We do not address this here because, as discussed above, the claim fails on pretext.

pretext stage. <u>Wimbley v. Cashion</u>, 588 F.3d 959, 962 (8th Cir. 2009). He has not offered any sound reason why we should excuse his failure to provide the necessary facts.[8]

Anderson argues Chapman's positive statements about his driving undermine Durham's proffered reason that he was a poor driver and are evidence of pretext. Recent positive performance evaluations sometimes may serve as evidence of pretext. <u>See</u> <u>Lewis v. St. Cloud State Univ.</u>, 467 F.3d 1133, 1137–38 (8th Cir. 2006); <u>Turner v. Gonzales</u>, 421 F.3d 688, 698 (8th Cir. 2005). Such evaluations may be particularly probative if they are part of a longer history of otherwise satisfactory performance. <u>See</u> <u>Turner</u>, 421 F.3d at 697–98. Here, however, Chapman's evaluations of Anderson's driving do little for his case. Durham had problems with Anderson's driving from day one, and the timing of her evaluations remains important. The record indicates that Chapman evaluated Anderson's driving in fall 2006 and when she administered the driving test in January 2007. Following these evaluations, management received complaints. Chapman's evaluations also predated the accidents that immediately preceded Anderson's ultimate termination.

Anderson also contends that the circumstances of his removal as a driver are indicative of pretext: he was "fired on the spot" by two African American managers, Chapman and McGee, with no investigation into the third accident prior to his

_____

[8]Anderson argues that he was prevented from identifying specific, similarly situated drivers because Durham admitted it did not keep accurate accident records. To support this assertion, Anderson cites in part the testimony of Jeff Hill, who appears to have served as General Manager after Anderson's termination. It is unclear from Hill's testimony whether he managed the same site at which Anderson was employed. In any event, Hill confirmed that typically, work orders are filled out for repairs and other work done on buses and that he caught a shop supervisor making a repair on a bus for which no work order had been completed. Even assuming this testimony is relevant, it cannot be stretched to mean what Anderson asserts it to say without resort to speculation.

termination, in violation of Durham policy to investigate accidents. We decline any invitation to hold a genuine fact dispute exists as to pretext simply because of the race of the individuals involved in his termination. Even if we considered that line of thinking, Huddleston's uncontested affidavit states that he, a white man, ultimately made the decision to remove Anderson as a driver and that McGee then delivered that decision. Anderson offers no evidence, other than his belief, indicating this was not the case.

Regarding the lack of investigation, although "an employer's violation of its own policies may be indicative of pretext," that is not always so. Dixon, 578 F.3d at 871. While this alleged violation indicates Durham was perhaps quick to act, federal courts do not serve as "super-personnel departments," sitting in judgment of an employer's business decisions absent evidence of discrimination. Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995). Anderson already had two preventable accidents, one just two days before the final incident. Durham could have taken corrective measures for any preventative action, based on its own evaluation of the circumstances and the driver's record. A third preventable accident should have meant automatic termination under company policy and Anderson acknowledged that Chapman offered him another position after removing him as a driver. On this record, we conclude any violation is insufficient to create a jury question as to pretext.

Anderson points to other evidence allegedly betraying Chapman's discriminatory motivations regarding his termination in particular. For example, he notes her failure to respond to mistreatment by fellow employees. As noted above, however, Anderson has not adduced sufficient evidence showing that Chapman was aware of the racial nature of the name calling by the group of African American drivers, which, of all the harassment, he suggests was the most serious. Moreover, even considering any failure on her part to address his complaints, "a strong inference" arises that "discrimination was not a motivating factor if the same individual hired and fired the plaintiff within a relatively short period of time." See, e.g., Arraleh, 461 F.3d at 976–77 (quotation omitted).

-14-

Ultimately, Anderson has not convinced us that a genuine question of fact exists regarding Durham's motivations. It remained his burden to show not only that Durham's proffered reason was suspect in some way, but that it was pretext for unlawful discrimination. See Dixon, 578 F.3d at 870. Because Anderson has failed to make a showing sufficient to establish the existence of an element of his claim, summary judgment is appropriate. Celotex Corp. v. Catrett, 477 F.3d 317, 322–23 (1986).

C. Age Discrimination

The district court determined that Anderson had failed to exhaust his administrative remedies as to his age discrimination claim and Durham urges us to affirm this holding on appeal. Exhaustion of administrative remedies is a condition precedent to the filing of an action under the ADEA. See, e.g., Shelton v. Boeing Co., 399 F.3d 909, 912 (8th Cir. 2005). We may reach the merits, however, if doing so provides a sounder basis for resolving the case. We elect to do so here and affirm the grant of summary judgment. See Eastling v. BP Prods. N. Am., Inc., 578 F.3d 831, 835–36 (8th Cir. 2009) (court of appeals may affirm summary judgment on any grounds supported by the record); Dorsey v. Pinnacle Automation Co., 278 F.3d 830, 835 (8th Cir. 2002) (in ADEA case, noting filing of timely charge is not a jurisdictional requirement and period for filing is subject to equitable doctrines such as waiver and estoppel). See also Allen v. Highlands Hosp. Corp., 545 F.3d 387, 400–03 (6th Cir. 2008) (concluding that exhaustion does not raise jurisdictional question under the ADEA and electing to reach merits of disparate impact claim).

The ADEA protects individuals over forty and prohibits an employer from "fail[ing] or refus[ing] to hire or . . . discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). Generally speaking, under the McDonnell Douglas framework, Anderson may establish a prima facie case of age discrimination with a showing that (1) he is over forty; (2) he was qualified for the position; (3) he suffered an adverse employment

action; and (4) similarly-situated employees outside the class were treated more favorably. See Thomas v. Corwin, 483 F.3d 516, 528 (8th Cir. 2007). We note at the outset that in discriminatory discharge cases, we have frequently stated that the last prong of the prima facie case is established by demonstrating the plaintiff was replaced by a substantially younger individual. See, e.g., McGinnis v. Union Pac. R.R., 496 F.3d 868, 875–76 (8th Cir. 2007); Thomas, 483 F.3d at 533; Lewis, 467 F.3d at 1136; Haas v. Kelly Servs., Inc., 409 F.3d 1030, 1035 (8th Cir. 2005); see also O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312–13 (1996) (prima facie case requires evidence adequate to create inference of discrimination, which cannot be drawn from the replacement of one worker with another worker insignificantly younger). Anderson does not contest that an older driver took over his route upon his termination.

Anderson argued below instead that "similarly situated younger employees were not subject to termination . . . for similar minor accidents which may or may not have gone unreported and/or investigated." Even if we were to assume that he could establish a prima facie case on this argument, it fails to establish pretext. He has not provided sufficient, specific evidence of disparate treatment to survive summary judgment. Anderson advanced no arguments to the district court regarding pretext as to age discrimination different from those offered as to his race discrimination claim, which we hold insufficient for the reasons stated above. Summary judgment was proper as to Anderson's age discrimination claim as well.

## III. Conclusion

For the foregoing reasons, we affirm. We deny Durham's motion to strike improper factual allegations as moot based on our holdings here.

_____