# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1354

_____

Julie Mahony,

    Plaintiff - Appellant,

v.

Universal Pediatric Services, Inc., et al.,

    Defendants - Appellees.

\*
\*
\*
\*
\*   Appeal from the United States
\*   District Court for the
\*   Southern District of Iowa.
\*
\*
\*

_____

Submitted: December 16, 2010
Filed: July 11, 2011

_____

Before LOKEN and BYE, Circuit Judges, and MARSHALL,\* District Judge.

_____

LOKEN, Circuit Judge.

Julie Mahony appeals the district court's[1] grant of summary judgment dismissing claims of wrongful termination against her former employer, Universal Pediatric Services, Inc. ("UPSI"); S. Tucker Anderson, its president and chief executive officer; and Connie Freeman, its principal owner. Mahony appeals only the

_____

    \* The Honorable D.P. Marshall Jr., United States District Judge for the Eastern District of Arkansas, sitting by designation.

    [1] The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

dismissal of the claim that she was wrongfully terminated in violation of Iowa public policy. Reviewing the grant of summary judgment *de novo*, and viewing the facts in the light most favorable to Mahony, the nonmoving party, we affirm. Yon v. Principal Life Ins. Co., 605 F.3d 505, 509-10 (8th Cir. 2010) (standard of review).

## I.

UPSI and its affiliates operate multiple home health agency offices in Iowa and neighboring States that provide home nursing care, primarily to pediatric and young-adult patients. The offices have been certified as approved Medicare providers by the federal Centers for Medicare & Medicaid Services (CMS), making them eligible for reimbursement of qualifying expenses under federal Medicare and state Medicaid programs. See 42 C.F.R. §§ 424.505, 424.510; Iowa Admin. Code rule 441-77.9. Medicaid reimbursement accounts for some eighty percent of UPSI's income.

Mahony was hired as UPSI's Vice President of Nursing in 2006. One of her principal responsibilities was ensuring compliance with federal and state Medicare and Medicaid requirements. She conducted audits of the quality of services provided by UPSI, remedied deficiencies identified by regulatory agencies, and oversaw the completion and submission of documents required by those agencies.

In mid to late 2007, UPSI decided to divide its overburdened office in Carroll, Iowa, by opening an office in Sheldon, a town about one hundred miles northwest of Carroll that also would be a more convenient work location for employee Tracy Gorter. Because the Carroll office was already an approved provider, CMS rules provided alternative ways in which UPSI could qualify for Medicare and Medicaid reimbursement for services provided from a new location in Sheldon. It could apply to have Sheldon certified as a new, stand-alone office, which requires submission and approval of a detailed CMS-855A form that all new providers must submit, followed

by an initial survey of the new office by an approved accreditation company.[2] Alternatively, UPSI could apply to open Sheldon as a branch of the Carroll office, which involves a much simpler approval process. See Form CMS-855A, at p.7, § 2. CEO Anderson decided to open Sheldon as a stand-alone office and instructed Mahony to proceed accordingly in late 2007 and early 2008.

In March 2008, UPSI's office in Newton, Iowa, received a notice of multiple compliance deficiencies from the Iowa Department of Inspection and Appeals. The Newton administrator was terminated, and Mahony's primary focus for the following two months was to deal with this compliance crisis and "maintain the functionality of the Newton office." By May 2008, Mahony had again turned her attention to the new Sheldon office project. Meanwhile, Gorter was anxious that an office be opened in Sheldon, closer to where she lived. In early May, Anderson told Gorter she could get the Sheldon office ready to open, but it could not yet open. Mahony admitted that a June 1 opening date was discussed in management meetings but testified that she warned Anderson that much needed to be done before the office would be approved for Medicaid reimbursement, including completion of the CMS-855A form, portions of which were the responsibility of billing manager Tammy Chapman.

Mahony testified that she first learned on June 3 or June 4 that phone, fax, and internet connection had been installed in the Sheldon office, and that Gorter had moved in and been told she could go to the office to fax and make phone calls and copies. Mahony immediately advised Gorter, "I do not feel comfortable with you working out of that office" because the CMS-855A form was not yet submitted and the CMS approval process would "take some time." At a management meeting on

---

[2]Form CMS-855A is the Medicare Enrollment Application for institutional providers. The function of enrollment is not to license a facility to provide services. Rather, enrollment allows a provider to seek reimbursement for services provided to Medicare and, under Iowa law, Medicaid beneficiaries. Thus, it is not illegal to open a home health agency in Iowa without completing and submitting Form CMS-855A.

June 5, Mahony told Anderson, "we cannot open this office until we go through the [CMS approval] process." Anderson became angry and heatedly blamed Mahony for the process being so far behind. Offended, Mahony stormed out of the office and worked on other matters from home for the next few days. Following the meeting, Anderson instructed Gorter to move out of the Sheldon office and work from home.

Mahony returned to work the following Monday, June 9. She filed a grievance with UPSI's Human Resources Manager asserting that permitting Gorter to move into the Sheldon office "is a violation of the Conditions of Participation of the CMS program," and complaining about Anderson's "harassing conduct" on June 5. UPSI immediately investigated Mahony's grievance with the assistance of outside counsel. The next day, the Human Resources Manager responded with a letter to Mahony. Regarding opening the Sheldon office, she wrote:

> Based on the interviews conducted, everyone agrees that the Sheldon office will not be opened and Tracy Gorter will not be moving into the Sheldon office until proper procedures have been followed and compliance standards are met. Everyone interviewed shared frustration with the process relating to the Sheldon office and with the timeline of receiving information regarding the requirements for the office.

Regarding Anderson's alleged harassment, the response stated, "based on the interviews, there was no discrimination or harassment," and added, "as part of company policy, retaliation will not be accepted." On June 13, UPSI terminated Mahony's employment. On June 26, UPSI applied to CMS for approval to add a branch of the Carroll office in Sheldon. Anderson testified that the application was approved and the Sheldon office began submitting claims for Medicaid reimbursement on July 15. This lawsuit followed.

-4-

## II.

Iowa law provides that an at-will employee may be discharged at any time, without cause, but a well-recognized exception to the at-will doctrine is the tort action for wrongful discharge in violation of public policy. Fitzgerald v. Salsbury Chem., Inc., 613 N.W.2d 275, 280-81 (Iowa 2000). The elements of this cause of action are (1) existence of a clearly defined public policy that protects an activity; (2) discharge from employment would undermine the policy; (3) the plaintiff was discharged as the result of participating in the protected activity; and (4) lack of other justification for the termination. Lloyd v. Drake Univ., 686 N.W.2d 225, 228 (Iowa 2004) (citations omitted). The first two issues are questions of law for the court to resolve. Fitzgerald, 613 N.W.2d at 282. Iowa courts "proceed cautiously, and will only extend such recognition to those policies that are well recognized and clearly defined." Lloyd, 686 N.W.2d at 229 (quotation omitted).

Mahony's primary argument on appeal is that she was terminated for objecting to and refusing to participate in her employer's plan to submit false claims for Medicaid reimbursement from an office in Sheldon that was not an approved Medicare provider, conduct that would violate clear and well-recognized public policy as expressed in federal statutes prohibiting fraud and the submission of false claims to the government. See 18 U.S.C. § 1001; 31 U.S.C. § 3729. In the district court, Mahony emphasized the claim that her termination violated the federal False Claims Act provision that protects whistleblowers, 31 U.S.C. § 3730(h)(1). She does not appeal the district court's dismissal of that claim, only the dismissal of her state law claim. We note the Supreme Court of Iowa has questioned whether "the public policy to support the tort of wrongful discharge in Iowa can be derived from a federal statute." Fitzgerald, 613 F.3d at 285 n.4. We need not address that question because, in any event, Mahony's public policy tort claim is factually flawed.

As the district court recognized, the principal flaw in this claim is that no false reimbursement claim was submitted and no acts of fraud occurred. Mahony agreed it was not unlawful to open the Sheldon office on June 1; her concern was submitting claims for Medicaid reimbursement before the office was an enrolled Medicare provider. She conceded she was not asked to submit false reimbursement claims from Sheldon. Indeed, no claims were submitted from Sheldon prior to her termination. The false-claim public policy theory is instead premised on Mahony's belief that, because UPSI derived the vast majority of its income from Medicaid reimbursement, its plan to open the Sheldon office without first enrolling with Medicare would inevitably lead to the submission of false claims for reimbursement.

The summary judgment record provides no factual basis for this contention. First, the premise of intent to defraud is contrary to undisputed fact. When Mahony pointed out the compliance problem on June 5, Anderson became angry and blamed Mahony, perhaps unfairly. But he immediately remedied the problem by directing Gorter to move her workplace out of the office. Second, Mahony's premise that the Sheldon office could not be approved to submit claims for Medicaid reimbursement until the time-consuming initial enrollment process was completed is simply wrong. UPSI had a quicker option -- which it exercised a few weeks later by enrolling Sheldon as a branch location of the enrolled Carroll office. We agree with Mahony that Iowa law protects employees who refuse to participate in unlawful activity, even if the unlawful activity did not in fact occur. See Fitzgerald, 613 N.W.2d at 286-87 (termination for refusing to commit perjury). But here, Mahony was not asked to participate in unlawful activity, and her speculation that UPSI was planning to break the law is contrary to undisputed fact.

Mahony argues the district court failed to recognize that CMS rules and regulations further the clear and well-defined public policy of protecting the health and welfare of the vulnerable people served by home health agencies. However, Mahony's alleged protected activity related to ensuring compliance with regulations

governing reimbursement, not with the quality of the healthcare services provided. This raises a serious question whether the regulatory requirement at issue will support an action for wrongful discharge in violation of public policy, or simply "impose[s] requirements whose fulfillment does not implicate fundamental public policy concerns." Jasper v. H. Nizam, 764 N.W.2d 751, 765 (Iowa 2009) (quotation omitted). We need not address this question because, as we have explained, no violation of the alleged public policy was at issue. Mahony, an employee responsible for regulatory compliance, brought an impending non-compliance issue to her employer's attention. UPSI took action to ensure continuing compliance and terminated Mahony for causing a resulting delay in lawfully expanding its operations. That internal employment dispute was governed by the at-will doctrine, not by its narrow public policy exception. Iowa courts apply this exception in a manner that ensures "the law will continue to give law-abiding employers the freedom to make managerial decisions in the operation of their businesses." Id. at 763.

In these circumstances, the district court correctly concluded that, viewing the facts most favorably to Mahony, her discharge did not undermine clearly defined public policy as a matter of law. The judgment of the district court is affirmed. We deny as moot Mahony's motion to strike portions of appellees' appeal brief. See Anderson v. Durham D & M, L.L.C., 606 F.3d 513, 524 (8th Cir. 2010).

BYE, Circuit Judge, dissenting.

In order to survive summary judgment on a claim of wrongful discharge in violation of Iowa public policy, Mahony is required to show a reasonable jury could find her engaged in an activity protected by a clearly-defined public policy, she was discharged for engaging in the protected activity, there was no other explanation for her discharge, and her discharge undermines the public policy. See Yon v. Principal Life Ins. Co., 605 F.3d 505, 510 (8th Cir. 2010). Because I conclude, when viewing the record in the light most favorable to Mahony, a reasonable jury could resolve the

-7-

wrongful discharge claim in her favor, I respectfully dissent. I would reverse the district court's grant of summary judgment and remand the case for trial.

I

The majority affirms the grant of summary judgment because it concludes Mahony has failed to demonstrate genuine issues of material fact. Specifically, the majority states Mahony's claim of engaging in a protected activity is "contrary to undisputed fact" because there is "no factual basis" for her belief that UPSI intended to file fraudulent Medicaid claims. Ante at 6. The majority then resolves Mahony's claim by concluding, "Mahony, an employee responsible for regulatory compliance, brought an impending non-compliance issue to her employer's attention. UPSI took action to ensure continuing compliance and terminated Mahony for causing a resulting delay in lawfully expanding its operations." Ante at 7. In reaching these conclusions, however, the majority ignores relevant evidence, fails to construe the evidence in the light most favorable to Mahony, and invades the province of the jury by engaging in impermissible fact finding.

The majority focuses on two discrete facts to reach its first finding as to UPSI lacking intent to defraud Medicaid: (1) Anderson instructed Gorter to move out of the Sheldon office after he was informed on June 5 of the delay in certification, and (2) once aware of the delayed certification, UPSI was able to acquire an alternate certification of the Sheldon office as a branch of the Carroll office within a few weeks. The majority reasons that by taking remedial measures, UPSI demonstrated it lacked any intent to defraud Medicaid and thus Mahony's "speculation that UPSI was planning to break the law is contrary to undisputed fact." Ante at 6. However, the facts are not undisputed and the remedial measures taken by UPSI after the June 5 confrontation do not necessitate the conclusion as to UPSI having no plan or intention to proceed with filing false claims for services rendered from the Sheldon office. While I agree the record could support a jury verdict consistent with the conclusion

-8-

made by the majority, it is not the only conclusion a reasonable jury could reach, and thus the issue of UPSI's intentions is not appropriate for summary judgment. See Fitzgerald v. Salsbury Chem., Inc., 613 N.W.2d 275, 289 (Iowa 2000) (concluding the record was "enough to withstand summary judgment" on the issue of protected activity because the facts supported an inference of an employee's intent to testify against the employer and thus the court should "leave it to the jury").

UPSI decided in the fall of 2007 to open an additional office in either Spencer or Sheldon. UPSI intended to set up the new location as a "subunit," which is essentially a stand-alone facility, and not as a branch of any existing office. Anderson indicated "it was always the plan once [UPSI] opened [a new office] to submit Medicare or Medicaid claims from there," because about 80% of the company's revenue was through Medicaid and it was never intended to operate as a private pay facility. Joint App'x at 283, 285. The new office was to open on June 1, 2008, and Mahony had the responsibility for acquiring the necessary CMS certifications for the new facility. Due to a moratorium on direct approvals, CMS certification as a stand-alone facility required hiring a company such as ACHC to complete the accreditation process. Such a process takes at least four to six months. Although Mahony was authorized to sign a contract with an accreditation company, only Anderson had the authority to make payment on it. In addition to hiring an accreditation company, certification required the submission of a CMS-855A form ("855A form"), a document which only Anderson had authority to execute.

Gorter, an employee of UPSI, desired to work from Sheldon and not Spencer, which was an additional forty-five minutes away, a preference she made clear to both Mahony and Anderson. In an email to Mahony on January 6, 2008, Gorter stated "[a]t the time I accepted my position with Ultimate Nursing Services, I was told future plans would be to look at opening an office in Sheldon," and went on to explain the reasoning for her strong desire to work from Sheldon, instead of Spencer. Id. at 419. On February 4, 2008, Gorter sent another email, this one to both Mahony

and Anderson, following up on an intense meeting in which the three discussed a potential office in Sheldon over Spencer. Sometime thereafter, the official decision was made to establish a location in Sheldon, but before an accreditation company could be selected, Mahony's attention was diverted to compliance issues at the Newton office. During the time Mahony was working at the Newton office, Anderson continued to communicate with Gorter, selecting an appropriate office building in Sheldon and preparing the office space. Gorter was anxious to begin working from the new office, and given Gorter's eagerness, Anderson had some concern that if the Sheldon office was not opened and clinical support staff was not provided promptly, the company "may not be able to retain" Gorter. Id. at 276. For a company which had just lost three high-level employees—including an administrator and a clinical nurse manager—in recent months, retaining current employees was a priority. In May 2008, Mahony was able to return her focus to Sheldon and began moving forward with selecting an accreditation company.

With this background in mind, emails from May 1 indicate Gorter wanted to start working from the Sheldon office sooner rather than later and sought updates on the timeline for moving her work to the new office. Anderson initially met Gorter's inquiries with hesitation by allowing her to move her things into the Sheldon office but emphasizing, "we are however at this time not 'opening' an office in Sheldon." Id. at 382. As the month went on, Anderson's emails became less hesitant. On May 20, after Gorter asked if she could begin work from Sheldon on May 21, Anderson instructed Gorter to "hold off until June 1st, that is the date we have for the opening." Id. at 383. At some time in early June, Gorter did move all her work to the Sheldon office and began working from there part of the time. On June 3, Mahony received an email from Gorter indicating she had approval to use the Sheldon office for part of her work and had "moved everything to the office so everything is in one place," but did take some work home, too. Id. at 430. Mahony responded to this message the afternoon of June 4 expressing surprise Gorter was performing any work from

-10-

Sheldon. Mahony stated "I do not feel comfortable with you working out of that office as we have to abide by the regulations that govern our business." Id.

The next day Mahony confronted Anderson about the situation, insisting Gorter should not be working from the Sheldon office until the proper certifications were in place. Anderson responded with anger, which he later explained was because he "was frustrated when [Mahony] revealed to [him] that she had not completed" the accreditation process. Id. at 68. He contended having "no idea that the 855 form hadn't been completed" and first learning of the delayed certification process when Mahony confronted him on June 5. Id. at 275. However, this explanation was contradicted by other evidence in the record indicating Anderson was kept informed of the certification status for at least one month preceding the June 5 confrontation with Mahony. Also contradicting Anderson's explanation was his own admission he had not signed the required 855A form or issued any payment on the certification process.

The record shows Anderson could have been aware of the delayed certification process as early as May 1. Anderson's own email to Gorter from that day suggests some hesitation with her moving into the office because they were "not 'opening' an office in Sheldon" at that time. Id. at 382. And the same day, Anderson engaged in an email conversation with Mahony about making a final decision between two potential accreditation companies. Based on his own emails, Anderson was likely aware on May 1 the process was already behind because, as the record indicates, it would take another four to six months to complete the accreditation process. Then, despite Anderson's contention that he did not speak again with Mahony on the certification topic until June 5, a May 8 email sent by Mahony to Anderson, Marcus Miller, and Connie Freeman indicated she would be starting the accreditation process with ACHC and would begin a review of the required manual. Mahony's email explained the process would require an "overhaul" of all policies and procedures for the home health aides, skilled nursing, and personnel. Id. Eleven days later, on

-11-

May 19, at a management meeting between Anderson, Marcus Miller, Connie Freeman, and Mahony, there was a discussion about establishing a plan and timeline for the accreditation process, moving forward with evaluating the new Sheldon office, recruiting a Sheldon Office Manager, and planning the transition to the new office. Thus, as of the May 19 meeting, the accreditation process was just beginning. Notably, this meeting took place just one day prior to Anderson's email exchange with Gorter in which he permitted Gorter to move into the Sheldon office but instructed her to "hold off until June 1st, [because] that is the date we have for the opening." Id. at 383, 409. Finally, on June 2, the status of the Sheldon office was discussed in another management meeting. Anderson, Miller, and Mahony were present and the meeting notes indicate they discussed the accreditation process was still in the early stages as the accreditation company had just been contacted to establish early guidelines for the process and the 855A form had yet to be submitted to CMS. The next steps included Mahony awaiting a return call from the accreditation company, which was expected by June 6.

Despite this evidence, Anderson alleges his disfavorable reaction toward Mahony on June 5 was because he was unaware the certification process was behind schedule and he had still expected a June 1 opening of the Sheldon office. As the record shows, throughout May Anderson was informed the process was in the early planning stages, and he should not have been surprised by the news on June 5. Further, if Anderson truly thought the certification was supposed to be in place by June 1, he should have been surprised and angered at the June 2 meeting in which the discussion made clear the process was not only incomplete, but was just beginning.

Additionally, during his deposition, Anderson conceded that while he knew he was the only person authorized to issue payment to an accreditation company and the only person authorized to sign an 855A form, he neither signed a contract with an accreditation company nor issued a payment to such a company, nor did he recall signing the 855A form at any time for the Sheldon office. According to Anderson,

-12-

he had not even seen "prior to June 1 an 855 form or any other form necessary to open [the Sheldon office]." Id. at 279. Anderson admitted that while Mahony could independently contract with an accreditation company, she did not have the authority to provide payment; that authority resided with him and he did not recall paying ACHC for any services before June 5. Thus, while claiming he was surprised to learn the certification had not yet been complete when he spoke with Mahony on June 5, Anderson concedes he was aware key steps in the process—payment for the necessary accreditation process and filing of an 855A form—were still outstanding.

Considering all the evidence in the record in the light most favorable to Mahony, I suggest a reasonable jury could conclude Anderson actually knew about the delay in the certification process as early as May 1 and his explanation for his anger on June 5 was incredible. Anderson did not react negatively when learning of the delay at the June 2 management meeting even though he claimed he expected a June 1 opening and he had yet to sign the forms or send the payments necessary for the certification process. Instead, a jury could conclude Anderson's anger on June 5 was attributable to a frustration other than the delay, such as Mahony's confronting Anderson about Gorter working from the uncertified Sheldon office. The evidence supports a conclusion as to Anderson having the motivation and intention to permit Gorter to operate from the Sheldon office—to ensure she continued employment with UPSI—while still billing Gorter's services to Medicaid as if they were rendered from the Carroll office. The "undisputed" evidence relied upon by the majority takes on a different light in this context because a jury could conclude UPSI's corrective actions were evidence of divergence from a plan or intent to defraud Medicaid, not necessarily evidence of the absence of any such plan or intent. For this reason, I cannot agree with the majority that the evidence of remedial measures taken by UPSI after June 5 indisputably negates any evidence of an intention by UPSI to file fraudulent Medicaid claims. Genuine issues of material fact exist as to UPSI's intentions.

-13-

The majority also concludes in a cursory manner as to UPSI having "terminated Mahony for causing a resulting delay in lawfully expanding its operations," which is the reason UPSI gave to justify the termination. Ante at 7. Generally, causation is a question of fact and "if there is a dispute over the conduct or the reasonable inferences to be drawn from the conduct, the jury must resolve the dispute." Fitzgerald v. Salsbury Chem., Inc., 613 N.W.2d 275, 289 (Iowa 2000). While UPSI states that was the reason it terminated Mahony, the record creates some dispute as to whether such reason is in fact true and whether it is the actual reason for Mahony's termination. The decision to open an office in Sheldon was made in February 2008, and Anderson instructed Mahony around such time to divert her attention for several months from the Sheldon office to handle the compliance issues in Newton. Thus, even though the process was delayed, it may not have been because of Mahony. And even though it was already early May before Mahony returned her attention to the Sheldon office, if Anderson still wanted to open the office by June 1, UPSI might have been able to do so by opening Sheldon as a branch. However, it was Anderson who insisted Sheldon be a stand-alone facility—requiring the four to six month process. While Anderson suggests this decision was based in part on his erroneous belief that an 855A was not required if the certification was completed by an accreditation company, it establishes the fact as to Mahony not being given the option of opening the Sheldon office as a branch. Based on such evidence, a jury could conclude UPSI's explanation for Mahony's termination was untruthful.

A jury could instead find Mahony was terminated as a result of confronting Anderson about potential false claims filings. Following the June 5 confrontation, Anderson next spoke with Mahony the morning of June 9. The content and atmosphere of the encounter is disputed between Anderson and Mahony; however, Anderson acknowledged he not only discussed the June 5 incident, but also instructed Mahony to develop a business plan to be discussed that afternoon so they could "talk about . . . whether [Mahony was] going to be employed with this company anymore." Joint App'x at 288. According to Mahony, the encounter was confrontational and

Anderson was angry and aggressive. The afternoon meeting to discuss Mahony's future employment was canceled, though, after Anderson learned Mahony had filed an internal grievance earlier in the day. The grievance, which included a complaint about Anderson's reaction on June 5 as well as expressed concern over the potential premature opening of the Sheldon office, was resolved later in the week. The next day, Mahony was terminated. Based on these events, it could be inferred Anderson, who made employment decisions with regard to Mahony, terminated her as a result of the June 5 confrontation or her internal complaint of a plan to open the Sheldon office before it was certified and not because of the alleged delay in acquiring the proper Medicaid certification.

II

In addition to concluding Mahony raised genuine disputes as to fact issues, I also would find the legal elements of Mahony's claim to be met. Addressing these legal issues briefly, I conclude Mahony's claim should survive summary judgment as it gives rise to "a clear public policy which would be adversely impacted if dismissal resulted from the conduct engaged in by the employee." Fitzgerald, 613 N.W.2d at 282.

First, the Iowa Supreme Court has suggested the filing of internal complaints about an employer's potential wrongful conduct "may be protected in certain circumstances" where the wrongful discharge claim is premised on "a well-recognized and defined public policy of the state." Ballalatak v. All Iowa Agric. Ass'n, 781 N.W.2d 272, 277 (Iowa 2010) (internal quotation marks and citation omitted). Mahony contends her discharge violated the public policy of protecting the health and welfare of those being cared for by home health agencies. However, I agree with the majority that this alleged public policy is not implicated by the facts of this case. See Ante at 6-7. Mahony has offered no evidence indicating CMS certification ensures a certain quality of care and, as Mahony concedes, it is not

-15-

illegal to open a home health office without CMS accreditation for private pay patients. Thus, the accreditation process is not likely based on ensuring the health and welfare of those under the health agency's care.

Nevertheless, Mahony's claim implicates another public policy, namely, promoting truthful submissions to the government regarding financial matters as required by a federal statute. While this is not a public policy previously recognized by the Iowa courts, existing Iowa case law and other authority cited by the Iowa Supreme Court suggest Iowa may be willing to recognize the protection of truthful financial submissions to the federal government as a public policy where such truthful submissions are promoted by federal law. Mahony points to various federal statutes prohibiting the submission of false documents or making misrepresentations to the federal government.[3]

The Iowa Supreme Court has not yet resolved whether a federal statute may provide a basis for Iowa public policy. See Fitzgerald, 613 N.W.2d at 285 n.4 (identifying, but declining to resolve, the issue of whether a federal statute may underscore a claim for wrongful discharge in violation of public policy). However,

---

[3]These statutes include the False Claims Act, 31 U.S.C. §§ 3729-3733; the False Statements Act, 18 U.S.C. § 1001 (making it a crime to knowingly and willfully falsify, conceal or cover up any material fact or to make any materially false statements or representations in connection with any matter within the jurisdiction of the federal government); 18 U.S.C. § 1035 (criminalizing the same conduct as the False Statements Act except only in connection with the delivery of or payment for health care benefits); 18 U.S.C. § 1347 (making it a crime to defraud or attempt to defraud any health care benefit program or to obtain money from a health care benefit program under false pretenses); 42 U.S.C. § 1320a–7b (making it a crime to make false statements in an application for, or fail to disclose the occurrence of any event that would affect the right to, federal health care benefits); 42 U.S.C. § 1320a-7 (establishing conditions under which owners and managers of home health agencies may be excluded from participation in a federal health care program, including such acts as health care fraud and Medicaid-related offenses).

the Iowa courts look primarily to statutes to identify public policies. Jasper v. H. Nizam, Inc., 764 N.W.2d 751, 762-63 (Iowa 2009) (looking to statutes because "[t]he legislature is the branch of government responsible for advancing public policy" charged with balancing "the competing interests of the employer, employee, and society"). And, in Smuck v. National Management Corp., 540 N.W.2d 669, 672 (Iowa Ct. App. 1995), the Iowa Court of Appeals concluded a federal law may be the basis of Iowa public policy. The facts of Smuck involved an employee who was terminated for refusing to violate federal law. Id. at 671. The court of appeals determined "it is contrary to public policy to fire an employee for refusing to break any law, be it state or federal," and held "federal law and policy can serve as a clear mandate of Iowa public policy." Id. at 673. To hold otherwise, Smuck reasons, would "leave many employees with the difficult decision of either breaking federal law or losing their jobs" while employees who refuse to violate state law would be protected. Id.

Following similar logic, in Martin Marietta Corp. v. Lorenz, 823 P.2d 100 (Colo. 1992), a case cited with approval twice by the Iowa Supreme Court in wrongful discharge cases, the Colorado Supreme Court upheld a wrongful discharge claim premised on the False Statements Act, 18 U.S.C. § 1001, where an employee was fired for refusing to misrepresent quality control deficiencies, an illegal act under the federal statute. Id. at 110 (cited by Fitzgerald, 613 N.W.2d at 286 and Jasper, 764 N.W.2d at 763). Specifically, an employee in Martin Marietta claimed wrongful discharge in violation of public policy because of being terminated for refusing to perform an act illegal under federal law, namely, refusing to misrepresent the quality of materials to NASA on a project funded by NASA. 823 P.2d at 103. The employee claimed his termination was a violation of public policy because he was fired for refusing to violate a federal statute, 18 U.S.C. § 1001 (False Statements Act). Id. at 104. In deciding this statute created a sufficient basis for public policy, the court noted "[t]his statutory prohibition is designed to protect governmental departments and agencies from the perversion that might result from the deceptive practices

-17-

described in the statute." Id. at 111. Citing an Illinois case, the court further explained "public policy favors full disclosure and truthfulness in financial reports to the government and . . . 18 U.S.C. § 1001 'establishes a clearly mandated public policy against deceptive practices aimed at frustrating or impeding legitimate functions of government departments or agencies.'" Id. at 111 (quoting Johnson v. World Color Press, Inc., 498 N.E.2d 575, 578 (Ill. Ct. App. 1986)). The Colorado Supreme Court found the policy in 18 U.S.C. § 1001 was "clearly expressed . . . favor[ing] truthfulness and accuracy in governmental reports." Id.

Even though the Iowa Supreme Court has not reached the issue of whether a federal statute can serve as a basis for Iowa public policy, I find the persuasive authority of the Iowa Court of Appeals in Smuck as well as the Colorado decision in Martin Marietta, as cited by the Iowa Supreme Court, to be instructive. Both support the conclusion that, if presented with this issue, the Iowa Supreme Court would favor permitting a federal statute, and specifically federal statutes promoting truthful submissions to the government regarding financial matters, to act as a basis for Iowa public policy.

Second, I would hold an employee's discharge for internally reporting potentially fraudulent Medicaid claims would undermine the public policy promoting truthful submissions to the government in financial matters. To demonstrate a public policy was undermined by an employee's termination, the employee must show "the conduct engaged in not only furthered the public policy, but dismissal would have a chilling effect on the public policy by discouraging the conduct." Fitzgerald, 613 N.W.2d at 284. Here, the conduct engaged in by Mahony furthered the public policy by preventing fraudulent claims from being filed and her dismissal for engaging in such conduct has a chilling effect by discouraging similar reporting in the future. See Teachout v. Forest City Comty. Sch. Dist., 584 N.W.2d 296, 303 (Iowa 1998) (concluding public policy to report suspected child abuse undermined by employee's termination for good faith intent to report child abuse); Lara v. Thomas, 512 N.W.2d

-18-

777, 782 (Iowa 1994) (concluding discharge for conduct which conforms to public policy creates a chilling effect on public policy by indirectly forcing employees to forego the conduct); Smith v. Smithway Motor Xpress, Inc., 464 N.W.2d 682, 684-85 (Iowa 1990) (concluding public policy of encouraging employees to file workers' compensation claim implicated when employee is terminated after receipt of workers' compensation benefits); Niblo v. Parr Mfg., Inc., 445 N.W.2d 351, 353 (Iowa 1989) (concluding public policy of encouraging employees to file workers' compensation claim is implicated when employee is terminated for threatening to file a claim). The district court disagreed, suggesting Medicaid's internal penalties for fraudulent filings were sufficient to protect public policy, but the existence of other incentives or disincentives does not determine whether certain conduct furthers the policy or would be chilled by termination. See Fitzgerald, 613 N.W.2d at 286 (holding termination for refusal to commit perjury would undermine public policy despite it being a punishable crime); see also Martin Marietta Corp., 823 P.2d at 105 (recognizing "[t]he threat of criminal prosecution would, in many cases, be a sufficient deterrent upon both the employer and the employee, the former from soliciting and the latter from committing perjury[,] . . . [but] in order to more fully effectuate the state's declared policy against perjury, the civil law, too, must deny the employer his generally unlimited right to discharge an employee . . . when the reason for the dismissal is the employee's refusal to commit perjury") (citation omitted). Thus, the existence of other incentives to filing truthful Medicaid claims does not preclude the chilling effect of an employer's discharge of an employee for acting in accordance with public policy.

III

I would conclude Mahony has presented a claim for wrongful discharge based on a public policy Iowa is willing to recognize, the public policy would be undermined if Mahony was terminated for engaging in conduct protected by that public policy, and Mahony has established genuine issues of material fact as to

-19-

whether she engaged in a protected activity and whether that was the basis for her discharge. I would therefore reverse the district court's grant of summary judgment.

_____